Argued May 31, affirmed July 16, reconsideration
denied August 14, petition for review denied
September 18, 1979

# STATE OF OREGON,
## *Respondent,*
### *v.*
## JOHN PRATT,
## *Appellant.*

## (No. 1682, CA 13354)

597 P2d 842

John T. Lewis, The Dalles, argued the cause for appellant. With him on the brief was Lewis & Foster, The Dalles.

W. Benny Won, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, Thornton, Buttler and Joseph, Judges, and Peterson, Judge Pro Tempore.

JOSEPH, J.

## JOSEPH, J.

■ Defendant, a member of the Yakima Indian Nation, was convicted of unlawful possession of food fish, the indictment alleging that he

> "did knowingly and unlawfully possess *** Salmon, which was unlawfully caught during a closed season, said possession occurring more than 12 hours subsequent to a season established under ORS 506.129 ***."

The theory of the prosecution was that the fish had been caught by gill-netting. Mere possession of salmon by defendant would not have been illegal, because as a member of the Yakima Nation he was entitled to fish at any time for subsistence or ceremonial purposes in the waters in question.

Prior to trial defendant moved to suppress evidence concerning the fish, which were seized from the back of a pickup truck he was driving, which was equipped with an enclosed canopy over the bed. The motion was denied. Defendant appeals, arguing that the stop of him and the truck was improper because the police officer did not have a basis for a reasonable suspicion that he had committed a crime, and that even if the stop was legal, the search was not.

■ It should be noted that the police did obtain a warrant to search the truck, but the supporting affidavit was clearly inadequate. From the early stages of the prosecution the state has disavowed any reliance on the warrant to support the search.[1]

On the night of the stop and the search and on the two preceeding nights, two Hood River County deputy sheriffs and a state game officer working together as a unit heard numerous Citizens' Band radio transmissions between persons in the parking lot in the Cascade Locks port area and persons in boats on the

---

[1] The invalidity of the warrant does not preclude the state from justifying the search on the basis of probable cause and exigent circumstances. *State v. Lafferty,* 19 Or App 643, 528 P2d 1096 (1974); *State v. Johnson,* 26 Or App 185, 552 P2d 554 (1976).

Columbia River. One deputy estimated that a total of seven people participated in the CB activity. The officers recognized some of them by name, including Virgil Hunt, whose CB "handle" was "Neverdo." They did not recognize defendant by name or voice. The officers described the CB activity, and especially that of Hunt, as follows:

"We were listening to numerous individuals concerned with fishing and advising each other where the patrol car was."

\* \* \* \* \*

"As we would go by the area where [Hunt] was parked, he would call the boats and advise them we were coming into the Boat Basin."

\* \* \* \* \*

"The first night when we heard Neverdo on the radio, we had just come into the port on just normal patrol \*\*\* and he was advising a boat not to come into the port area when we drove down in, so we would drive back out and he would advise them that we were out of the area and when he would, we would turn around and go back, attempting to catch somebody and then sort of excitedly they would notify them again not to come back in, and this went on quite some time."

\* \* \* \* \*

"On, I believe all three nights, [Hunt's] pickup with him in it, I believe along [*sic*]— I don't recall anybody else in it—was backed up to the area where the platforms are that they dip fish off of and he was in it. Like I say, as we would come by them he would notify the other units we were in the area \*\*\*."

\* \* \* \* \*

"*Earlier [on the night of the stop and search]* they were talking, Virgil Hunt was— Neverdo, the handle he goes by, to the boats, advising them when we were in the port area. One time one of them went across the river and tied up. That seemed a little suspicious, he didn't want some boats coming in when a boat was out there without lights on, he didn't want it coming in because police officers was in the area."

\* \* \* \* \*

"They were all talking to each other, calling each other and advising them not to bring the boat in because the patrol car was in that area."

\* \* \* \* \*

"We would state we were checking out at our office and he would say,[2] 'go ahead, bring the boats in' and then we would come back in the area and they would yell back and forth screaming on the radio 'get the boats out of here, they are coming back;' they got real excited a couple of times and cut each other out on the radio."

The state concedes that no words such as "fish," "salmon" or "gillnet" were ever heard in the CB conversations. The deputies inferred from the conversations that something illegal was going on and from the total circumstances concluded it was illegal fishing by Indians. One deputy stated:

"[L]istening to them it was evident something illegal was going on or we assumed they were trying to move some illegal fish."

In response to the question "What grounds did you have for believing that the fish were illegally caught?" he responded, "From the conversation over the CB with the boats." The other deputy explained:

"[H]ad it been at another location and another situation, I would have suspected narcotics traffic but they were keeping us out of the area where the boat was coming back etcetera, but given the situation of the fact the fishing was going on and we were picking up a lot of fishing violations, or Trooper Nelson was, that's what, in my mind, was going down, illegal fishing."

On the night defendant was stopped, one deputy and the state police officer were on foot in the port area with a walkie talkie. The other deputy was in a patrol car just outside the area. The officers heard a statement on the Citizens' Band to the effect "They are in now" or "They have it in now" and concluded that

---

[2] There was evidence that Hunt had a police frequency scanner in his truck.

meant the illegally caught fish were on land. Someone then called over the CB for gunny sacks and a tarp, items the officers knew from their experience were used when transporting fish. The deputy who had been in the port area testified he saw the sacks and tarp taken into the Indian encampment area of the port. The tarp was carried by a young woman. Fifteen or twenty minutes later they saw a pickup truck come out of the encampment. It was the first vehicle to come out of that area after the tarp was taken in. The deputy referred to a statement made in the interim by CB radio that "the vehicle was loaded."

When the truck came out of the encampment, the deputy in the port radioed the other deputy, describing the truck and stating it was the one believed to be hauling the fish. The deputy in the car stopped the truck, driven by defendant, as it entered Cascade Locks. He asked defendant for his driver's license, and defendant gave it to him. At some point, Hunt and the other two officers arrived on the scene. Just what transpired before those officers arrived is not entirely clear, nor is the sequence of subsequent events. Defendant testified as follows:

"A  When he pulled me over, I got out of the pickup and asked him what seemed to be the problem and they asked me what I had in the back of the pickup. I asked them if they wanted to see my license and they took them, but they weren't really interested.

"*  *  *  *  *

"A  Well, after I gave them my driver's license I asked him why I was stopped and they just kept saying that they wanted to look in the back of the pickup. They gave me the driver's license back, told me I wasn't under arrest but I couldn't move the pickup.

"Q  What did you say?

"A  I went down the street and got a cup of coffee and called you up.

"Q  Did they ask—was that all the conversation?

"A Well, they wanted to look in the back of the pickup and I told them no and they said 'Do you mean that in order for us to look in the back of that pickup we are going to have to get a search warrant?' I told them if they wanted to look in the back they were going to have to get one.

"Q And did they, in fact, later on obtain a search warrant?

"A Yes.

"Q And where were you at this time?

"A I was waiting right there.

"Q Did you ever make an attempt to drive off?

"A I started to. I asked them if I was under arrest and they said no and I told them I was leaving and they told me if I left I would be placed under arrest so I just stayed there.

"Q Was anyone else present besides you and this county sheriff?

"A Not at the time.

"Q Did another police officer or officers arrive at a later time?

"A Yes."

After the state police officer arrived and examined defendant's driver's license, he told defendant

"that we wanted to have a look in the back and he said no and he mentioned about he would rather we had a search warrant before we looked in there, and I told him fine, I was going to look around a little. And I went to the back of the pickup, shined the flashlight on it and on the right corner of the tailgate I noticed there was three or four salmon scales there and a little moisture ***."

The deputy who arrived with the state officer testified:

"Q When [the fish scales were discovered], was that before Officer Nelson left to obtain a search warrant?

"A Yes. He took the scales with him before he went for the search warrant, yes.

"Q All right. And did you go with him when he got the search warrant or did you remain?

"A No, I remained at the vehicle.

[155]

"Q And did you, while you were present, did you hear Mr. Pratt or observe Mr. Pratt attempt to drive the vehicle off and leave?

"A I—at no time—he attempted to, he stated, 'What would you do if I left?' I stated, 'I would probably stop you again.'

"Q Who gave that reply?

"A I don't recall whether it was [the other deputy] or myself.

"Q All right. So was he deprived of his freedom to leave at that time?

"A No. He did, in fact, leave.

"Q But it was the pickup truck that was kept?

"A That's correct.

"Q And you would not allow him to take it?

"A I suppose if he got in it we would have stopped him again. Yes, he would have been allowed to move it but we would have stopped him.

"Q Would you have arrested him?

"A I can't say. We didn't stop him, so we didn't put it to the test. I didn't feel we had to.

"Q But clearly he did not, at that moment, have the opportunity, as far as you two officers were concerned, to take the pickup and move it anywhere?

"A He wasn't going to move the pickup until we procured the search warrant, that is correct."

The other deputy also testified:

"Mr. Pratt called Neverdo after the stop was made and said that he had been stopped and they were going after a search warrant and what was he to do after they found the fish and Neverdo told him—says 'Tell him we caught them off the platforms the last two or three days and they belong to the company.' Mr. Pratt asked him who the company was and Neverdo advised him of the names of the people talking on the CB's and they were the company."

When the state officer returned with the warrant, the rear of the truck was searched and the fish were found. When they were examined, they showed signs of having been gill-netted.

■ We conclude that the initial stop and detention of defendant and the truck for a reasonable time while inquiry and examination were made was valid. The facts available to the police were sufficient to support the "reasonable suspicion" required by ORS 131.615. *See State v. Mickelson,* 18 Or App 647, 526 P2d 583, *rev den*(1974). We have noted, however that

> "[t]he 'reasonable suspicion' needed to justify stopping a vehicle may be of a quality which would not meet the requirements necessary to establish probable cause to arrest." *State v. Huddleston,*5 Or App 9, 13, 480 P2d 454, *rev den* (1971).

That is the case here. The state does not argue that, at the time of the stop, the police had probable cause to arrest defendant or to search the truck.

The state does argue that the discovery of the water and fish scales provided the additional information necessary to give the officers probable cause to believe that a crime had been committed and that illegally caught fish would be found in the truck. As noted above, however, it was not illegal for defendant to have salmon in his possession: he had the right to fish by certain methods for subsistence and ceremonial purposes. Because we hold that probable cause existed after the conversation between defendant and Hunt was heard, it is not necessary for us to decide whether the combination of the furtive conduct of Hunt and the people on the boat together with the observations of the truck by the officers, including the water and fish scales, constituted probable cause by themselves.

■ ■ The inferences that the officers could reasonably have drawn from defendant's post-stop CB conversation with Hunt were sufficient, when considered along with the earlier CB transmission, to give them probable cause. To support a finding of probable cause, the post-stop "statements" must have been lawfully obtained. *See State v. Evans,* 16 Or App 189, 517 P2d 1225, *rev den* (1974). Because the warrant was invalid and the state seeks to uphold the search on the basis of

[157]

probable cause and exigent circumstances, it had the burden of proof on those issues.[3] *See State v. Gilbert,* 24 Or App 907, 547 P2d 632,*rev den* (1976).

The period of permissible detention following a stop is limited. ORS 131.615. Once reasonable inquiry of defendant and examination of the truck had been completed — and we need not here express any conclusion as to just when that was — the officers had no authority to detain the truck, unless they then had probable cause to believe it contained illegally caught fish. Had defendant been free to take the truck, he would have driven away. The timing of the CB conversation with Hunt is therefore crucial: if it was heard within the period of reasonable inquiry after the stop, probable cause came into existence.

■ Although the significance of the timing of that conversation relative to other events appears not to have been fully appreciated at trial, and the evidence on the point was not well developed, we find testimony which would support a finding that the conversation took place during the period of reasonable inquiry, prior to the time the state police officer left to get the warrant. The court could have found that Hunt arrived on the scene prior to or near the time the state police officer left. There must have been some interval between the CB call from defendant and Hunt's arrival. As noted above, the state police officer first asked defendant if he could search the truck. When the defendant indicated he would prefer the officers had a warrant, the officer said he would get one, but he then proceeded to examine the outside of the truck. The court could have found that the call to Hunt was made while the officers were examining the truck's exterior. The court made no express finding on the point, but we presume that it found the statement was made then. *See State v. Warner,* 284 Or 147, 585 P2d 681 (1978); *Ball v. Gladden,* 250 Or 485, 443 P2d 621

---

[3] On appeal the question of exigent circumstances is not contested.

(1968). After that there was probable cause to search the truck.

Affirmed.