Argued and submitted December 15, 1980, affirmed March 16,
reconsideration denied May 21,
petition for review denied June 16, 1981 (291 Or 118)

## STATE OF OREGON,

*Respondent,*

*v.*

## ALVIS WILLIAM SMITH,

*Appellant.*

(No. C79-06-32073, CA 17774)

## STATE OF OREGON,

*Respondent,*

*v.*

## ALEX LEON SMITH,

*Appellant.*

(No. C79-06-32074, CA 17838)

(cases consolidated)

625 P2d 1321

Mary Linda Pearson, Lapwai, Idaho, argued the cause and filed the briefs for appellants.

Jan P. Londahl, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts, Judge, and Campbell, Judge Pro Tempore.

ROBERTS, J.

## ROBERTS, J.

Defendants, Warm Springs Treaty Indians, were convicted by a jury of possession of food fish illegally taken in another state, ORS 509.105, a class A misdemeanor, and the felony of illegal transporting of food fish, ORS 509.011. Their indictments as to ORS 509.105 alleged as follows:

"The said defendant, on or about May 18, 1979, in the County of Multnomah, State of Oregon, did unlawfully and knowingly possess, import into this state and transport within this state, food fish unlawfully taken under the laws of the State of Washington, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon."

The indictments as to ORS 509.011 alleged the following:

"The said defendant, on or about May 18, 1979, in the county of Multnomah, State of Oregon, did unlawfully and knowingly make use of a vehicle, to-wit: a 1978 Chevrolet pickup, to transport food fish unlawfully taken during a closed season and unlawfully brought into this state of a total value of more than $200, and did possess said fish more than 12 hours prior to or more than 12 hours subsequent to a season established under ORS 506.129 by the State and Wildlife Commission, the particular waters where the fish were caught being unknown to the Grand Jury, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon."

Defendants' motion to dismiss for lack of jurisdiction and motion to suppress were denied.

On appeal, defendants assign as error the trial court's: (1) denial of their motions for dismissal and suppression, (2) failure to sever their trials in the absence of a motion to consolidate, and (3) entry of a judgment for conviction of a crime for an offense which defendants maintain could only be a violation.

On May 18, 1979, Alex L. Smith was driving a pickup truck belonging to Alvis Smith west on Highway I-80 (now I-84) from Cascade Locks toward Portland. With him in the truck were Alvis Smith and Alvis' girlfriend, Audrey George. At the Bridal Veil entrance to the highway, an Oregon State Police pickup truck driven by Officer Richard McDonald entered the westward flow of traffic.

McDonald was assigned to the Fish and Game Division. Defendants' pickup passed the police truck. McDonald, whose truck was not equipped with radar, decided to pursue defendants to check for speeding. He paced the defendants for two miles before stopping them. He approximated their speed at 62 miles per hour. McDonald approached Alex, the driver, and asked for his driver's license, explaining the reason for the stop. He then ran a check on the license. There were no outstanding violations. He told Alex he would not cite him for speeding, but gave him a warning.

Smelling fish, McDonald asked defendants what was in the back of the truck. Alvis replied that it was "baggage" or "cargo."[1] The officer then walked around to the back of the truck, where he observed water dripping out of a corner of the truck bed. He asked if he could take a look in the back of the truck. Alvis got out of the truck, went to the back, opened the rear canopy and pulled back the tarpaulin. He testified McDonald asked him to do these things and that McDonald then pulled back the whole tarp, uncovering four fish boxes full of salmon. McDonald could not remember whether Alvis acted at his request or not. Seeing marks on the fish which indicated they had been gill-netted, McDonald asked where the fish were from and whether defendants had any permits to possess them. Alvis told him the fish had been caught by Yakima Indians in the Klickitat River in Washington and that defendants had purchased them for a ceremonial dinner for deceased relatives. He and Alex both produced cards identifying themselves as members of the Confederated Tribes of the Warm Springs Reservation. (Defendants say they also showed Columbia River Indian hunting and fishing licenses.) McDonald then announced he was seizing the fish as gill-netted salmon and issued defendants a citation for illegal possession of salmon in a closed season. He radioed for help, loaded the fish into his vehicle and transported them to Portland where they were sold to a seafood wholesaler, as provided by ORS 506.690.[2]

---

[1] Alvis testified at the suppression hearing he said "cargo." Alex Smith testified he said "baggage." McDonald testifed Alvis "implied it was baggage."

[2] ORS 506.690(2) provides:

The state's contention is that the fish had been gill-netted and thus were illegally taken under the laws of Washington state. Defendants and their witnesses contend that the fish were caught by traditional Indian fishing methods — dip net and bag net — by Yakima Indians fishing at a "usual and accustomed" off-reservation fishing place, and that applicable Oregon administrative law allowed the sale of "subsistence" fish from one tribe to another. The state stipulated that if the fish in question were caught by Yakima Indians on the Klickitat River at a usual and accustomed fishing place, by traditional Indian fishing gear of dip net and hoop net, the fish would have been legal, and, further, that the possession of the fish by defendants would not be illegal if the fish had been caught legally.

## JURISDICTION

Defendants' principal argument is that, because the fish seized by the Oregon State Police had been caught by a Yakima Indian in the Klickitat River at a "usual and accustomed" off-reservation fishing place, and since the Yakimas are members of the Columbia River System Treaty Indian Fishery, with subsistence fishing rights, the State of Oregon lacked subject matter and personal jurisdiction in the case. Defendants contend that according to federal case law, treaties and tribal resolutions jurisdiction could only lie in the U. S. District or tribal courts. This position not only misinterprets federal Indian fishing law, it also confuses matters of jurisdiction with matters of defense.

The treaties between the federal government and the Yakimas[3] and between the government and the "Indians in Middle Oregon,"[4] Walla-Walla and Wasco Indians who make up the Confederated Tribes of Warm Springs Indians, secure to the tribes "the exclusive right of taking fish in all the streams running through or bordering their

---

"Any fish seized under the provisions of subsection (1) of this section may be disposed of, sold, preserved or used for food purposes, under the rules of the commission, to prevent loss or spoilage. * * *."

"* * * * * *"

[3] 12 Stat 951 (1859).

[4] 12 Stat 963 (1859).

reservations, and the right to take fish at all usual and accustomed places in common with the citizens of the Territory."[5] A "usual and accustomed place" is one where members of a tribe have customarily fished from time to time at and before treaty times, regardless of distance from the tribes' habitat or concurrent use by other tribes. *U. S. v. Washington,* 384 F Supp 312, 332, (W D Wash 1974), *affd* 520 F2d 676 (9th Cir 1975), *cert den* 423 U S 1086 (1975), *vacated on other grounds,* 443 U S 658 (1979).

The bulk of the cases cited by defendants[6] have to do with the manner in which a state may regulate Indian fishing rights when those rights have been secured by treaty.[7] That states *may* regulate Indian fishing under certain circumstances is clear. The *Puyallup*[8] cases established that while the right to take fish at usual and accustomed places cannot be qualified by the state, the manner of fishing, size of take and any commercial fishing may be regulated for conservation purposes. The standards used for regulation, however, must be "appropriate" and not discriminate against Indians. *Puyallup I,* 391 US at 398. Appropriate standards are those for which the state has demonstrated that the means proposed are a reasonable and necessary conservation measure and must be applied to Indians in order to achieve the conservation goals. *Puyallup II,* 414 US at 45; *Accord, U.S. v. Washington, supra,* 520 F 2d at 683; *Sohappy v. Smith,* 302 F Supp 899 (D. Oregon 1969).

---

[5] 12 Stat at 953 and 964. At the time the treaties were first proposed (1855), both Oregon and Washington were territories. Oregon became a state in 1859, a month before the ratificiation of the Middle Oregon Treaty. Washington became a state in 1889.

[6] *Antoine v. Washington,* 420 US 194, 95 S Ct 944, 43 L Ed 2d 129 (1975); *Puyallup Tribe v. Dept. of Game,* 391 US 392, 88 S Ct 1725, 20 L Ed 2d 689 (1968)(Puyallup I), *Washington Game Dept. v. Puyallup Tribe,* 414 US 44, 94 S Ct 330, 38 L Ed 2d 254 (1973) (Puyallup II), and others.

[7] The Supremacy Clause of the U. S. Constitution, Art. VI, establishes treaties as "the supreme law of the land":

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding."

[8] See n. 7, *supra.*

Other cases cited by defendants establish the right of the Yakimas to regulate treaty fishing rights of tribal members without state interference. *U.S. v. Washington, supra,* in addition to holding that the state could only regulate Indians' off-reservation treaty fishing to conserve fishery resources, held that tribes meeting certain qualifications and conditions could regulate the treaty fishing rights of their own members. These necessary conditions included procedures for enforcement, identification of members, and reporting. 384 F Supp at 340-41. *Settler v. Lameer,* 507 F2d 231 (9th Cir 1974), established the Yakimas' right to regulate tribal fishing at all usual and accustomed off-reservation sites. *Lameer* noted that the first Yakima regulations for tribal fishing were adopted in 1966 and were expanded in 1968 to provide off-reservation enforcement. These regulations established seasons and specified permissible methods, gear and fishing sites. 507 F2d at 232.

At the time defendants were arrested, Yakima Tribal Council Resolution T-51-79, establishing the Klickitat River salmon fishing season, was in effect. The season was from noon February 1, to noon May 28, 1979, and August 23 to December 24, 1979. This resolution specified that the legal methods of taking edible fish from the Klickitat were by dip net, set bag net, and rod and reel; all other methods were declared unlawful. The taking of salmon by Yakimas using gill nets in the Klickitat would thus have been in violation of Yakima tribal laws and subject to enforcement by the Yakimas themselves. In addition, the Oregon Administrative Rules governing the Columbia River System Treaty Indian Fishery provide at OAR 635-41-025 that:

"(1) It is lawful at all times to take food fish for subsistence purposes by dip net or bag net of a mesh size not exceeding 5 inches attached to a hoop 24 feet or less in circumference, or by spear, gaff, club, or fouling-hook.[9]

"(2) It is *unlawful* to use gill nets, set nets, hoop nets, setlines, or dip nets or bag nets of a mesh size exceeding 5

_____

[9] Subsistence fishing is defined at OAR 635-41-010 to mean "taking food fish for Indians' personal use, including sale or exchange with other treaty Indians, but not sale or trade with non-Indians." Other Columbia River treaty Indians are the Warm Springs tribes, the Nez Perce and the Umatillas. OAR 635-41-005.

inches, or any other type of fishing gear, not otherwise specifically authorized in section (1) of this rule, except during the times and in the areas where such gear is authorized for commercial fishing. (Emphasis in original.)"[10]

Other evidence showed that there was no gill net season on the Klickitat River in 1979. The taking of the fish by gill nets would thus have been in violation of Washington state law as well. It is questionable who would have had jurisdiction to prosecute any alleged unlawful taking of the fish by the Yakimas.[11] However, the offense charged was not the taking of the fish and was not one provided for by tribal regulations. The state alleges defendants are guilty of *possessing* fish unlawfully taken under the laws of Washington and *transporting* into Oregon fish unlawfully taken during a closed season and unlawfully brought into this state.[12] ORS 131.215, which provides the basis for personal jurisdiction in criminal matters, states: "Except as otherwise provided * * * a person is subject to prosecution under the laws of this state for an offense that he commits by his own conduct * * * if: (1) Either the conduct that is an element of the offense or the result that is an element occurs in this state * * *." Defendants' conduct, which violated the statute, occurred within this state.

### MOTION TO SUPPRESS

Defendants' second assignment of error deals with denial of the motion to suppress and alleges that there was neither probable cause nor exigent circumstances to justify the search of defendants' vehicle, that any consent given was invalid, and that the scope of the search exceeded the

[10] At the time of defendants' arrest, this rule was OAR 635-35-25. The present OAR 635-41-010 was OAR 635-35-010, and OAR 635-35-005 was re-numbered OAR 635-41-005.

[11] This court said in *State v. Gowdy,* 1 Or App 424, 462 P2d 461 (1970), that an Indian fishing off-reservation in violation of both tribal regulations and state game laws is outside the treaty rights to which he or she is entitled and is in the same position as any non-Indian who violates state fishing laws. Yakima Tribal Council Resolution T-51-79 places jurisdiction over violations of its terms with the Yakima Indian Nation.

[12] ORS 509.011(2)(b) provides that it is unlawful to transport food fish unlawfully taken during a closed season *or* unlawfully brought into the state. ORS 509.105 likewise makes it unlawful to "possess, import *or* transport" food fish unlawfully taken. (Emphasis added).

scope of the consent. Defendants also argue that the stop for speeding, made by an officer assigned to the fish and game division, driving a pickup truck not equipped with radar, was a pretext stop requiring suppression of any evidence seized as a result thereof. Where there is a legally justifiable basis for a traffic stop, the court will not inquire further into an officer's motive. *State v. Tucker,* 286 Or 485, 493, 595 P2d 1364 (1979). The trial court found there was "nothing to impugn the purpose of his stop." However, such a stop cannot, by statute, provide the basis for detention, search, or interrogation outside the scope of "the immediate circumstances that aroused the officer's suspicion," ORS 131.615(3), unless the officer has a legally sufficient articulated basis for extending the duration of the stop. *State v. Wight,* 48 Or App 731, 735, 617 P2d 928 (1980). Officer McDonald stated that when he smelled fish he was suspicious because he knew there was no open season for fish in the area in which he contacted defendants, and that he knew of purchasers for illegally taken fish in Portland, which was in the direction defendants were heading.[13]

---

[13] The state argued at trial that there was a permissible statutory inference that possession of food fish in Oregon, on, near, adjacent to or in the vicinity of the Columbia River during the closed season is prima facie evidence that the fish were unlawfully taken. ORS 506.610 provides:

"1) The possession or custody of food fish on, near, adjacent to or in the vicinity of any waters of this state, during the closed season on such waters, is prima facie evidence that such fish were unlawfully taken during the closed season on such waters.

"(2) In all cases where such possession or custody by accused persons on, near, adjacent to or in the vicinity of any of such closed waters is proven, the burden of proof is shifted to the persons found having such possession or custody, to establish that the fish were lawfully taken during an open season and from waters from which it was at such time lawful to take such fish."

The Oregon Fish and Wildlife Commission is empowered to establish seasons for the taking of food fish by ORS 506.129:

"(1) After investigation of the supply and condition of food fish, the commission, at appropriate times each year, shall by rule:

"(a) Prescribe the times, places and manner in which food fish may be taken or sold, except when canned or otherwise processed, and the amounts of those food fish species that may be taken or sold.

"* * * * *.

"(2) In carrying out the provisions of subsection (1) of this section, the power of the commission includes, but is not limited to:

In *State v. Pratt,* 41 Or App 149, 151, 597 P2d 842 *rev den* (1979), affirming the conviction of a Yakima Indian for unlawful possession of food fish, we noted that "[m]ere possession of salmon by defendant would not have been illegal, because as a member of the Yakima Nation he was entitled to fish at any time for subsistence or ceremonial purposes in the waters in question." In *Pratt,* as in this case, the state's charge was that the fish had been caught by gill-netting. In both cases the fish were seized from the back of a pickup truck equipped with an enclosed canopy over the bed. In *Pratt* police obtained a warrant to search the truck, but the supporting affidavit was found inadequate; the stop, subsequent search of defendant's truck and seizure of fish were found by this court to be justified because the police had intercepted citizens band radio conversations between an Indian fishing encampment and boats coming into port which provided probable cause to believe illegal fishing activity was taking place. We declined to decide whether police observation of the truck, including water and fish scales found on the rear of the vehicle, considered with furtive conduct by those on shore and on the boats, would have amounted to probable cause.

We need not decide the issue of probable cause here, since we conclude Alvis Smith voluntarily opened the

---

"* * * * *.

"(b) Prescribing such regular and special time periods and areas closed to the taking and selling of any food fish species when the commission determines such action is necessary to protect the supply of such food fish."

The Warm Springs Indians and other members of the Columbia River System Treaty Indian Fishery are exempted from the operation of ORS 506.129 by ORS 506.045, which provides:

"There are excused from the operation of ORS 506.129, 506.136, 507.030, 508.025, 508.285, subsection (1) of 509.025 and ORS 509.216, any Warm Springs, Umatilla, Yakima, Wasco, Tenino, Wyum and other Columbia River Indians affiliated with these tribes and entitled to enjoy fishing rights, who have not severed their tribal relations, in so far as it would conflict with any rights or privileges granted to such Indians under the terms of the treaties made by the United States with the Warm Springs Indians on June 25, 1855, and with the Umatilla and Yakima Indians on June 9, 1855."

We note, however, that ORS 506.610 is an evidentiary statute governing matters of proof at trial. It does not defeat a police officer's reasonable inference that possession of food fish by any person, including a Treaty Fishery Indian, near the Columbia during a closed season is grounds to suspect illegal fishing activity.

rear of the truck and exposed the fish cargo defendants were carrying. *See State v. Kennedy,* 290 Or 493, 624 P2d 99 (1981). Defendants' position is that they were in custody of Officer McDonald while alongside the highway, and that therefore a consent could only be valid if preceded by advice of the right to refuse, citing *State v. Williams,* 248 Or 85, 432 P2d 679 (1967)and *State v. Hinsvark,* 3 Or App 195, 471 P2d 859 (1970).[14] This court defined the significant considerations for determining when a defendant is "in custody" in *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1972). There we said that the major indicia of custody are whether a defendant (1) could have left the scene of the interrogation voluntarily, (2) was being questioned as a suspect or merely as a witness, and (3) freely and voluntarily accompanied police to the place of the questioning. 31 Or App at 860. We see no reason to apply a different standard in this case.

Defendants emphasize the first factor, since Officer McDonald testified at trial that defendants were not free to leave during his conversation with them. There is no indication, however, that this information was communicated to defendants. It was on that basis that we held in *State v. Ferrell,* 41 Or App 51, 596 P2d 1011 (1979), that defendants initially stopped on suspicion of driving under the influence were not in custody when the officer detained them on the suspicion that an additional crime had been committed. We likewise hold these defendants were not in custody.

There is a factual dispute as to whether or not the officer asked Smith to open the rear of the truck, and whether Smith's actions in doing so were in response to such a request. Regardless, we find defendant's act to be the kind of "consent by conduct" following an investigatory police request to search an automobile which is constitutionally sound without advice to occupants of their right to refuse the search. *State v. Ragsdale,* 34 Or App 549, 579 P2d 286 (1978); *State v. Radford,* 30 Or App 807, 568 P2d 692 (1977). The voluntariness of the consent is determined by the totality of the circumstances, and advice of the right

---

[14] In *Williams* the defendant was in custody at the police station; in *Hinsvark,* an automobile stop for suspicion of illegal activity in drugs, the defendant was advised of his rights and consented before police searched the vehicle.

to refuse is only one factor to be considered. *Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 Led 2d 854 (1973); *State v. Kennedy, supra.* The motion to suppress was properly denied.

## CONSOLIDATION OF TRIALS

■ Defendants third assignment of error is that defendants were prejudiced by the consolidation of their trials in the absence of a motion by the state to consolidate. On the morning of the trial the state filed a consolidated indictment. Defendants' failure to object at trial waived this assignment of error. *State v. Applegate,* 39 Or App 17, 591 P2d 371 (1979).

## CRIMINAL CONVICTION

■ ■ The indictment in this case charges defendants with "unlawfully and knowingly" possessing and transporting food fish unlawfully taken in another state and "unlawfully and knowingly" transporting food fish unlawfully brought into the state. Defendants were issued a fish and game citation. They argue that neither ORS 509.011 nor ORS 509.105 require a culpable mental state because they are outside the criminal code, and therefore they could only have been found guilty of a violation and not of a criminal offense.[15] An offense inside or outside the Oregon Criminal Code is a violation if it is so designated or if it is punishable only by a fine, forfeiture or other civil penalty. ORS 161.565, 161.575. An offense defined by a statute outside the Oregon Criminal Code that requires no culpable mental state constitutes a violation, notwithstanding any other law existing at the time ORS 161.105(2) was enacted, and unless a statute enacted after January 1, 1972, otherwise provides. ORS 161.105(2). The penalties for violation of 509.011 and 509.105 are set out at ORS 506.991:

"(1) Except as provided in this section violation of any provision of the commercial fishing laws, or of any rule promulgated by the commission in carrying out the commercial fishing laws, is a Class A misdemeanor.

---

[15] ORS 161.095(2) provides:

"Except as provided in ORS 161.105, a person is not guilty of an offense unless he acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state."

An offense is either a crime or a violation or a traffic infraction. ORS 161.505.

"(2)  In lieu of the fine provided in ORS 161.635, and in addition to the imprisonment provided in ORS 161.615, any violation of this section is punishable as follows:

"(a)  For the first conviction, a fine not to exceed $1,000.

"(b)  For the second conviction within a 10 year period, a fine not to exceed $2,500.

"(c)  For the third conviction within a 10 year period, a fine not to exceed $10,000.

"(d)  For the fourth and subsequent convictions within a 10 year period, a fine not to exceed $25,000.

"(3)  Violation of any provision of ORS 509.011 which occurs more than 12 hours prior to or more than 12 hours subsequent to a season established under ORS 506.129 by the commission for the lawful taking of food fish when the total value of the food fish is $200 or more is a Class C felony.

It cannot be said that the statutes require no culpable mental state. The context requires that they do. *See State v. Stroup,* 290 Or 185, 620 P2d 1359 (1980, *Linde J., concurring*). The legislature has defined the offenses as crimes, and "we ordinarily assume that it does not intend to make a criminal of one who has no reason to know the facts that make his conduct unlawful." 290 Or at 208. As crimes, the offenses would normally require a culpable mental state unless it could be said it was

"An offense defined by a statute outside the Oregon Criminal code clearly indicat[ing] a legislative intent to dispense with any culpable mental state requirement for the offense or for any material element thereof." ORS 161.105(1)(b).

We can read no such intent into the statute. The offenses are not designated as violations, but as class A misdemeanors or class C felonies. They are not punishable by only fine or forfeiture. The penalty chosen by the legislature includes a fine in addition to "the imprisonment provided in ORS 161.615" for a misdemeanor. For a violation of 506.991(3), a person may be sentenced to a maximum term of imprisonment of more than one year. ORS 161.525. We determine that a culpable mental state was required. The state alleged that defendants had acted "knowingly," and a jury so finding could properly convict defendants of the crimes charged.

Affirmed.