Argued and submitted March 17, reversed and remanded September 29, 2010

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

MARCO ANTONIO ZAMORA,
aka Henry Zepeda-Torres,
*Defendant-Respondent.*

Washington County Circuit Court
C070882CR; A141236

240 P3d 91

Douglas F. Zier argued the cause for appellant. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

No appearance for respondent.

Before Landau, Presiding Judge, and Ortega, Judge, and Sercombe, Judge.

ORTEGA, J.

## ORTEGA, J.

The state appeals a trial court order suppressing all evidence seized during a search of defendant's residence and evidence of defendant's inculpatory statements made during that search. ORS 138.060(1)(c). Because we conclude that defendant consented to the search, we reverse and remand for further proceedings.

We state the facts consistently with the trial court's findings, which are supported by evidence in the record. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). The relevant facts are, in this case, largely undisputed. Two sheriff's deputies, Yazzolino and Irving, went to defendant's residence after receiving a report that "Tony," who lived at defendant's address, had possession of a stolen laptop. When defendant answered the door, the deputies identified themselves and asked if they could speak with him, and he consented to their entry. Yazzolino asked to see identification, looked at the identification card that defendant produced, and returned it to defendant without running a warrant check. Yazzolino asked defendant if he knew someone named Tony, and defendant explained that he was called Tony.

Yazzolino informed defendant that he thought that defendant might have purchased a stolen laptop. Defendant said that he had only two computers, one in the living room and one in his bedroom. After defendant showed the deputies a desktop computer in the living room, Yazzolino asked to see the computer in the bedroom. Defendant consented but asked whether they had a "good reason" for talking to him. Yazzolino replied, "I wouldn't be there if I didn't."

Defendant led Yazzolino to his bedroom, where Yazzolino saw a second desktop computer and—contrary to defendant's earlier statement that he had only the two computers—a laptop. Defendant helped Yazzolino look for the serial number on the laptop so that Yazzolino could check whether it had been stolen; it turned out not to have been stolen. Yazzolino noticed other computer equipment and electronics in defendant's bedroom and, with defendant's consent, checked the serial numbers on some of that equipment. Those numbers also had not been reported stolen.

While talking with defendant about the laptop and serial numbers, Yazzolino noticed an open duffel bag next to defendant's nightstand that contained "dime baggies" and a glass pipe. In Yazzolino's training and experience, such baggies are used to package illegal drugs, and glass pipes are often used for smoking methamphetamine. Yazzolino asked to search the bag; defendant agreed and helped Yazzolino move the bag onto the bed for searching.

In the bag, Yazzolino found a golf-ball-sized bag of a white crystalline substance, which he asked defendant to identify. Defendant replied that it was "cut" and acknowledged that he meant MSM, which is a chemical used as a cutting agent for methamphetamine. Yazzolino asked where the drugs were, and defendant answered that he smoked them and most of the time had the drugs on his person. Yazzolino asked to search defendant's person, and defendant consented. That search did not yield any drugs. Irving asked if the deputies could use a drug-sniffing dog to search the room, and defendant consented to that. Irving asked to search a suitcase, and defendant consented to that as well.

After spotting a gun case under the bed, Irving asked for consent to search the case. Defendant consented to that search and told the deputies that he had two AK-47s inside it. Defendant then volunteered that he had a prior felony charge. When Yazzolino asked about other weapons, defendant stated that there were guns under the mattress; the deputies looked and found two pistols there. At that point, Yazzolino advised defendant of his *Miranda* rights. Defendant was placed under arrest.

About 20 to 30 minutes had passed since the deputies' arrival at defendant's residence. Yazzolino described the entire encounter as conversational in tone. Defendant described the deputies as "pushy" but also testified that they used "good words" and were "nice." There was no evidence that they made any threats or promises to obtain defendant's consent to search. Defendant never asked the deputies to leave or told them that he no longer wanted to talk with them. After receiving *Miranda* warnings, defendant made additional incriminating statements. A further search of

defendant's bedroom uncovered another baggie containing MSM and two baggies containing methamphetamine.

Defendant was charged with unlawful delivery of methamphetamine, ORS 475.890; unlawful manufacture of methamphetamine, ORS 475.886; unlawful possession of methamphetamine, ORS 475.894; and four counts of felon in possession of a firearm, ORS 166.270. Before trial, he moved to suppress his inculpatory statements and all evidence obtained in the search of his residence. The prosecution argued that the contact between defendant and the deputies was "consensual and voluntary."

The trial court granted the motion to suppress. The court found that defendant consented to the deputies entering his bedroom and looking at the computers. The court concluded, however, that the deputies had no "reason for the encounter" after learning that the laptop in defendant's bedroom was not reported stolen; the court equated the deputies' act of running serial numbers from the other electronic equipment with keeping a person's identification and running it for warrants. The court reasoned that, "[a]t some point, the encounter has to stop, and the officers need to leave. * * * [A]ny consent that is given thereafter is mere acquiescence in a process that is going to continue to go on until something is found."

On appeal, the state assigns error to the trial court's granting of defendant's motion to suppress. In the state's view, no stop occurred until defendant was given *Miranda* warnings and arrested. Rather, the state contends, defendant voluntarily consented to the deputies' entry into his residence and never revoked consent to any aspect of the search. We agree and, accordingly, reverse and remand.

■ A warrantless search violates Article I, section 9, of the Oregon Constitution unless justified by an exception to the warrant requirement; consent is one such exception. *State v. Dunlap*, 215 Or App 46, 53, 168 P3d 295 (2007). If the state relies on a defendant's consent to validate a warrantless search, it must prove by a preponderance of the evidence that the consent was voluntary; the test for voluntariness is whether, under the totality of circumstances, the defendant's consent was an act of free will or, instead, resulted from

police coercion. *Id*. Absent an express revocation of initial consent, the permitted inference is that the initial consent continues. *State v. Ford*, 220 Or App 247, 251, 185 P3d 550 (2008).

Here, defendant expressly agreed to allow the deputies to enter his home and then to look in various places, and there is no evidence that his consent resulted from any coercion or illegality. Defendant never revoked his consent to any part of the search; to the contrary, the deputies asked for his consent to search various places and, each time, defendant agreed to allow them to search. Nor was defendant's consent the product of an unlawful stop. The deputies did not stop defendant until the point when they gave him *Miranda* warnings and arrested him. It is well settled that "a police-citizen encounter without any restraint of liberty (*e.g.*, mere conversation, a non-coercive encounter) is not a 'seizure' and, therefore, requires no justification." *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) (citation omitted). An encounter does not become a seizure "merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer." *Id*. at 410. Rather, a seizure occurs under Article I, section 9, when a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives a person of his or her freedom of movement or when a person believes that his or her freedom of movement has been so restricted and that belief is objectively reasonable. *Id*. at 409-10.

Here, the deputies' requests for consent to search were not a show of authority such that a reasonable person would believe that his liberty had been intentionally and significantly restrained. Whether the deputies had a "reason for the encounter" is not the pertinent inquiry. Because defendant voluntarily consented to each component part of the search, the search was lawful. Accordingly, the trial court erred when it granted defendant's motion to suppress.

Reversed and remanded.