Argued and submitted August 14, affirmed October 24, 2012, petition for review denied March 28, 2103 (353 Or 428)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## BYRON GILBERT PICKLE,
*Defendant-Appellant.*

Josephine County Circuit Court
09CR0706; A150197

288 P3d 1039

Jason E. Thompson argued the cause for appellant. With him on the brief was Ferder Casebeer French & Thompson LLP.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Nakamoto, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Defendant was charged with unlawful possession and delivery of marijuana after a police officer discovered over 60 pounds of marijuana during a search of his vehicle. Defendant filed a motion to suppress, arguing that the search violated Article I, section 9, of the Oregon Constitution because the officer conducted it without first obtaining a warrant.[1] The state defended the legality of the search on two grounds: first, that defendant voluntarily had consented to the search and, second, that the search was permissible under the "automobile exception" to the warrant requirement. The trial court denied defendant's motion, ruling that "the evidence is admissible under either and both the Automobile Exception and Consent theories"; in other words, the court ruled, "either of [the state's] theories validates the search and seizure independently of the other theory." Defendant then entered a conditional no-contest plea, reserving his right to appeal the trial court's denial of his suppression motion. On appeal, defendant renews his argument that the discovery of marijuana resulted from an illegal search. For the reasons set forth below, we affirm.

In reviewing the trial court's denial of defendant's suppression motion, we take the facts "from the trial court's findings and other record evidence, [viewed] in the light most favorable to the state." *State v. Guggenmos*, 350 Or 243, 245, 253 P3d 1042 (2011). Because we affirm on the ground that the trial court did not err in ruling that defendant consented to the search, we focus on the facts relevant to that issue, most of which were described in testimony that Grants Pass detective Josh Nieminen and defendant gave at the suppression hearing.

At that hearing, Nieminen testified that the search occurred after he was dispatched, just before midnight, to a

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Defendant also cited the Fourth Amendment to the United States Constitution in his suppression motion, but he did not develop a separate argument under that provision, and he does not pursue a federal constitutional argument on appeal.

motor-vehicle crash that had occurred in the parking lot of a sports pub. When he arrived, he saw that a small car and a large Ford Excursion had collided, resulting in the front right fender of the small car being pushed into the front driver's-side tire of the Excursion. After an investigation, Nieminen concluded that neither defendant, who had been driving the Excursion, nor the driver of the other car had been driving under the influence of intoxicants. While Nieminen conducted the DUII investigation, another responding officer, Sergeant Hamilton, completed paperwork related to the crash.

When the DUII investigation was complete, Nieminen told defendant and the other driver that he and Hamilton "could help them get their vehicles separated" in a way that would minimize additional damage. In what he described as a "pretty nonchalant and low key" manner, Nieminen said something to the men along the lines of "Let's see if we can get these apart now." At that point, Nieminen testified, he was trying to help defendant and the other man leave. When defendant got into his car, Nieminen "detected an overwhelming odor of a green marijuana." Nieminen, who has investigated hundreds of drug cases, testified at the suppression hearing that the odor was "very, very strong" and it was "very clear" to him "that there was a substantial amount of marijuana"—more than an ounce—somewhere nearby. Nieminen could not, however, immediately tell where the odor was coming from, as he was standing on the driver's side of the small car, which was between him and the Excursion.

Before investigating the marijuana odor, Nieminen told defendant how to move the Excursion in a way that would disengage it from the other car; that maneuver probably took less than a minute. Defendant drove about 10 feet away, stopped, and got out of the Excursion without prompting. At that point, Nieminen was closer to the driver of the other car than he was to defendant, so he spoke to that other man first. That man adamantly denied having or smoking marijuana; in addition, Nieminen could see inside the small car and observed nothing consistent with the strong odor he had smelled. Accordingly, Nieminen walked over to defendant, who was standing just outside the open driver's door of the Excursion. As the officer got closer to

the Excursion, it became clear that the odor was coming from that vehicle. Nieminen asked defendant if he had marijuana on his person or in the car; defendant responded affirmatively, leaned into the open vehicle, and retrieved two marijuana buds from the ashtray.

Defendant's description of events up to that point did not materially contradict Nieminen's. Although he did not testify about any odor of marijuana, defendant acknowledged having handed Nieminen the two marijuana buds. With respect to subsequent events, however, Nieminen's testimony and defendant's differed significantly. Nieminen testified that, because he did not believe that the strong odor was consistent with only two buds of marijuana, he asked defendant if he could search the Excursion for more. In response, Nieminen testified, defendant said that he could search the front of the vehicle. That search revealed only a tin that had some more marijuana in it, but not an amount that would account for the overwhelming odor—an odor that did not change when Nieminen opened the tin. At that point, Nieminen, who had noticed some large boxes in the back of the Excursion, asked defendant for consent to search the back of the vehicle because he "want[ed] to make sure he didn't have pounds of marijuana in there." According to Nieminen, defendant "walked towards the back of the vehicle and opened the hatch up," then continued holding it open for Nieminen because the hatch, which was heavy, would not stay open on its own. Nieminen was not comfortable climbing into the Excursion with defendant holding open the hatch because it would give defendant "control over [Nieminen's] route of escape." Instead, the other officer on the scene came over and held the hatch open. Nieminen took the boxes out of the Excursion and opened them, revealing large amounts of marijuana.

Nieminen described his own demeanor throughout the encounter as nonchalant, if anything, "too relaxed." He did not draw a weapon, handcuff defendant, or make any threats or promises. Throughout the process, which took 25 or 30 minutes, Nieminen and defendant casually joked about the different types of marijuana that were in the boxes (the marijuana was in bags that had labels like "Velvet Elvis" and "Purple Urple"). Defendant told Nieminen that there

should be just over 60 pounds of marijuana in the boxes and, indeed, Nieminen found a total of about 60.5 pounds. When the search was complete, Nieminen allowed defendant to leave in the Excursion, and he referred the charges to the district attorney's office for prosecution.

Defendant's version of events was different. Although he acknowledged handing Nieminen the two marijuana buds, he testified that he did not consent to any search of the Excursion: "I never gave him permission to search anything." Defendant acknowledged that he initially lifted the back hatch of the Excursion, but said that he then set it back down. According to defendant, Nieminen then reopened the hatch and entered the vehicle. Defendant testified that he did not hold the hatch open for Nieminen, but told him that somebody else would have to hold it because it would not stay open by itself. Defendant asserted that he only "went ahead with whatever [Nieminen] said" because Nieminen had said that he had probable cause to search the vehicle and was going to do so.

In his written motion to suppress, defendant anticipated that the state would defend Nieminen's search of the Excursion both on the ground that defendant had consented to the search and on the basis that the "automobile exception" to the warrant requirement applied, and he made arguments countering both theories. With respect to consent, defendant's argument was not complicated; he asserted simply that he "denie[d] that he consented to the search of the vehicle."

The state presented the two arguments that defendant had anticipated, both in its written response to defendant's suppression motion and at the hearing on that motion. Regarding consent, the state urged the court to accept Nieminen's version of events, which the state argued was, for several reasons, more credible than defendant's. The state argued specifically that defendant "consented to the search of the back portion of his car" by, in response to Nieminen's request, "walking to the back of the Excursion, and opening it up for Officer Nieminen," and then offering to keep holding it open.

In response, defendant argued at the hearing that he had not consented to Nieminen's search of the Excursion and, specifically, had not opened the hatch for him:

"And the officer's testimony today he clearly, clearly establishes there was never any verbal consent. I think we nailed everything down to the opening of the rear hatch of the truck for the search.

"And we have two different stories, describing basically the exact same thing, which is people went to the back of the truck and pulled up the hatch in the back. [Defendant] says that he didn't do it. *** [The] officer came over and pulled it open.

"The—the very, very little difference in the description of what happened, but it makes a huge difference as far as the question of was there consent? We know for a fact that there was no consent up to that point in time by—no verbal consent. So, the only consent would be if [defendant] voluntarily went over there and opened up the hatch and said, 'Okay. Here it is.'

"Now, you look at his demeanor today and—and you look at his prior experience, his prior knowledge, not good maybe, but his prior knowledge to the—I mean, can you imagine any particular reason why he would suddenly at that point walk over and say, 'Okay. Go ahead and open up the door.' ***.

"And if that is not the case then there is no consent because there's agreement, there's nothing in the record after today's testimony from the detective that he consent[ed] at any other time, as far as the back of that truck is concerned."

The trial court found Nieminen's testimony credible and adopted the state's version of the facts. As noted, the court ruled in the state's favor both on the ground that defendant voluntarily had consented to the search and on the ground that the search was justified under the automobile exception to the warrant requirement. With respect to consent, the court found that defendant had, in fact, opened the Excursion's back hatch after Nieminen requested consent to search the rear of the vehicle:

"When [Nieminen] asked if he could look in the back, Defendant did not *orally* consent; he actually walked to the back of his Ford Excursion and opened up the hatch. Further, he offered to hold the hatch up for Nieminen as the hatch device was not working properly."

(Emphasis in original.) The court found that defendant's actions amounted "to a manifestation of consent"; as the court put it, "[t]here could be no other explanation of Defendant's actions but to conclude that he consented to the search of the back of the Excursion." The trial court also determined that defendant's consent was voluntary, given, among other things, defendant's "cordial" interaction with Nieminen and the officer's "respectful and non-coercive" approach. Accordingly, the court denied defendant's motion to suppress.

On appeal, the parties renew their arguments about both consent and the automobile exception. We begin and end with the consent analysis, which is dispositive. Our opinion in *State v. Zamora* summarizes the burden that the state assumes when it seeks to justify a warrantless search based on the defendant's consent:

"A warrantless search violates Article I, section 9, of the Oregon Constitution unless justified by an exception to the warrant requirement; consent is one such exception. If the state relies on a defendant's consent to validate a warrantless search, it must prove by a preponderance of the evidence that the consent was voluntary; the test for voluntariness is whether, under the totality of circumstances, the defendant's consent was an act of free will or, instead, resulted from police coercion. Absent an express revocation of initial consent, the permitted inference is that the initial consent continues."

*State v. Zamora*, 237 Or App 514, 518-19, 240 P3d 91 (2010), *rev den*, 350 Or 297 (2011) (internal citation omitted).

Here, defendant does not argue that any consent he gave was involuntary; rather, he claims that he did not consent to Nieminen searching the Excursion *at all*. Defendant acknowledges that consent may be manifested by conduct. *See State v. Martin*, 222 Or App 138, 142, 193

P3d 993 (2008), *rev den*, 345 Or 690 (2009) (so stating). For two reasons, however, he argues that his conduct did not authorize the search that Nieminen conducted.

Defendant first contends that his act of opening the Excursion's hatch did not manifest consent to Nieminen's entry into the vehicle. Rather, he suggests, his actions amounted to nothing more than "mere acquiescence" to the officer's actions. In support of that argument, defendant relies on *Martin*, in which we held that "whether a defendant consents to police entry when she opens a door [to a house] and then retreats depends on the particular facts in each case." *Id.* at 143. In that case, police officers had gone to a residence to which they believed a driver had fled after being involved in a hit-and-run accident. *Id.* at 140. Some officers knocked on windows and asked the driver to go to the front door, where another officer was knocking. *Id.* After about two minutes, the driver, who was nude, "flung open" the front door, turned, and ran into a back bedroom. *Id.* at 140-41. Officers entered the home, found the bedroom into which the driver had run, and eventually arrested her for DUII. *Id.* at 141. The driver moved to suppress evidence that officers found as a result of the warrantless entry into her home, and the trial court denied that motion, ruling that "by opening the door, [the driver] tacitly invited the officers to enter." *Id.* We reversed and held that, given the circumstances, the state had failed to prove that the driver consented to the officers' entry. *Id.* at 142. We explained that the nude driver's hasty act of running away and retreating into her bedroom "suggest[ed] that she did not want to talk to the police," which further suggested "that her actions did not invite them in." *Id.* at 144. We concluded that "the state did not meet its burden of proving by a preponderance of the evidence that [the driver's] actions amounted to anything more than passive acquiescence" to the officers' entry into her home. *Id.*

The state responds that this case is not analogous to cases, like *Martin*, in which we held that the mere act of opening a residence door in response to a knock does not necessarily manifest consent to a police officer's entry into the home. Instead, the state argues, a better analogy would be to a case in which "police contact a defendant outside his

home, ask consent to search the interior of the residence, and the defendant opens [the] front door to allow police entry."

We agree with the state. A person who opens a door in response to knocking or the ringing of a doorbell may simply be engaging in what society views as a usual response to that kind of signal—acknowledging the presence of a visitor and creating an opportunity for communication with the person who is at the door. The same cannot be said of a person standing outside a car who opens the door or hatch of that car in response to an officer's request for consent to search it. That act does not merely create an opportunity for conversation with the inquiring person; indeed, given that both people are located outside the vehicle, opening its door is not necessary to facilitate further communication between the parties. Rather, depending on the circumstances, the act of opening the vehicle door may reasonably be viewed as giving the officer access to the inside of the vehicle—*i.e.*, as manifesting nonverbal consent for the officer to search it. *See State v. Smith*, 51 Or App 223, 226, 232-33, 625 P2d 1321, *rev den*, 291 Or 118 (1981) (the defendant consented to an officer's request to search his truck by opening the rear canopy and pulling back a tarp). Here, Nieminen testified that, after he asked defendant whether he could check the back of the Excursion to make sure that defendant did not have pounds of marijuana in it, defendant walked to the rear of the vehicle, opened the hatch for Nieminen, and continued holding it open until Hamilton relieved him of that task. The trial court found Nieminen credible and adopted the state's version of events. Given those findings, the court did not err in determining that defendant consented to Nieminen searching inside the back (as well as the front) of the Excursion.

Defendant also argues that his actions did not amount to consent to search the boxes that were in the back of the Excursion. Although defendant does not phrase the argument in these terms, we understand his contention to be that, even if he may have consented to Nieminen looking into the back of the vehicle, his consent did not extend to opening the boxes. That scope-of-consent argument is not preserved for our review. In his written suppression motion, defendant simply denied having consented to any search of the vehicle.

At the suppression hearing, the parties' arguments similarly focused on whether defendant had consented to the search *at all*. Defendant particularly emphasized his assertion that he had not opened the hatch for Nieminen, who had "pulled it open" himself. Defendant never argued separately that, even if he had opened the hatch, thus allowing Nieminen to look inside the Excursion, the scope of that consent did not include opening and searching the boxes. Not only did defendant not make any scope-of-consent argument in the trial court, the record might have developed in a materially different way had he done so. We decline to address the unpreserved argument. *See State v. Jones*, 217 Or App 110, 115, 174 P3d 1037 (2007) (the defendant's trial-court argument that "no consent was given at all" did not preserve a scope-of-consent argument for appeal).

Affirmed.