Argued and submitted April 25, 2014, reversed and remanded December 9, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

VINCENT MICHAEL LOWELL,
*Defendant-Appellant.*

Marion County Circuit Court
11C50888; A151865

364 P3d 34

Robin A. Jones, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

This criminal appeal concerns defendant's motion to suppress evidence. After defendant crashed his bicycle into a car and was injured, he separately interacted with two police officers. A police officer at the accident scene ordered him to go to the hospital. A second police officer, who was investigating the accident, arrived after defendant requested treatment at the hospital, entered his treatment room, and smelled marijuana. That officer asked for and obtained defendant's consent to search the backpack and discovered in it marijuana and other related paraphernalia, including a digital scale. The officer informed defendant of his *Miranda* rights, and defendant admitted that he regularly sold marijuana. Then the officer seized defendant's cell phone and reviewed incriminating text messages. Ultimately, defendant was prosecuted and unsuccessfully moved to suppress the evidence from his backpack, his statements, and the text messages. Defendant was then convicted of one count of delivery of marijuana for consideration, ORS 475.860(2)(a), based on a conditional guilty plea.

In three combined assignments of error, defendant challenges the trial court's denial of his motion to suppress the evidence. He argues that the police seized him by compelling him to seek medical treatment at the hospital and, in doing so, violated his right to be free from unreasonable seizures under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Based on that premise, defendant argues that all evidence obtained after the bicycle crash was unlawfully obtained and, therefore, should have been suppressed. We conclude that, regardless of whether defendant was unlawfully seized initially—an issue we do not decide—the police did not exploit that seizure to later obtain the physical evidence found in his backpack or his incriminating statements. As for defendant's text messages on his cell phone, in light of the United States Supreme Court's decision in *Riley v. California*, ___ US ___, 134 S Ct 2473, 189 L Ed 2d 430 (2014), the trial court incorrectly analyzed suppression of the text messages under the "search incident to arrest" exception to the warrant requirement under the Fourth Amendment. Accordingly, we conclude that the trial

court did not err when it admitted the physical evidence or defendant's statements, but did err when it admitted the text messages. Because we do not engage in harmless error analysis on an appeal from a conviction based on a conditional guilty plea, we reverse and remand.

## I. FACTS

When reviewing a trial court's denial of a motion to suppress, we are bound by the trial court's findings of historical fact provided that there is evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make detailed findings on disputed issues of historical fact, we infer that the trial court made findings consistent with its ultimate conclusion. *State v. Watson*, 353 Or 768, 769, 305 P3d 94 (2013). We present the following facts with that standard in mind.

A. *The Alleged Seizure of Defendant at the Accident Scene*

While riding his bicycle the wrong way in a bicycle lane, defendant crashed into a car and flew over the handlebars. Defendant hit the vehicle with enough force to break his bicycle at the handlebars, rendering it inoperable. He suffered a cut on his forehead, and he had blood on his face.

Paramedics and Officer Riddle were the first responders at the accident. Riddle, who was ending his shift, chose to respond in case emergency medical assistance was necessary; he knew that other officers beginning their shifts would be dispatched to actually investigate the accident. The paramedics tried to persuade defendant that he needed to go to the hospital, but he did not have medical insurance and refused. The paramedics enlisted Riddle's help in persuading defendant to seek medical treatment.

Riddle tried to "convince" defendant that he needed to go to the hospital. Riddle was concerned that defendant was injured, based on the paramedics' statements, the blood running down defendant's face, and his "common sense" that bicycle-car crashes can result in serious injuries to bicyclists. He also believed that defendant, who "looked very young," was a "kid," and he was concerned about his "community care taking" "obligation" to help an injured minor, although he did not inquire as to defendant's age. Riddle

testified that he stressed his concern during his conversation with defendant: "[The paramedics] are concerned about you. I am concerned about you. You need to go to the hospital." He testified, "I essentially gave him a choice. I said, you can voluntarily go down with the paramedics, or I will take you to the hospital, but you need medical treatment."

Their conversation lasted one to two minutes. Riddle described his tone as "encouraging" and "out of concern and convincing." He testified that he routinely interacts with injured community members who are reluctant to seek medical treatment because of the expense. He tries to reassure those people that they "are not in trouble" and that, even though medical treatment is expensive, their immediate health is more important than the cost. Riddle characterized his conversation with defendant as typical of those conversations, which he perceived to be part of his "community care taking" obligation to "force people to go get medical treatment" in certain circumstances. Riddle and defendant never discussed a criminal investigation, and he was "completely shocked" when he later received the subpoena in this case. In his words, "I thought it was a kid riding a bicycle that got hit by a car and needed to go to the hospital. And that was the end of it."

Defendant had decided to go to the hospital and was in the ambulance when the second officer, Officer Folkerte, arrived. Folkerte took over as the primary officer at the scene because Riddle's shift was ending. Folkerte spoke with Riddle regarding the details of the crash and learned that defendant would be transported to the hospital in the ambulance.

At the accident scene, Folkerte began to suspect that "other things [were] going on." A paramedic told Folkerte that defendant was acting "very guarded" and "extremely paranoid" and that defendant had made the unusual request to drop off his backpack at a friend's house on the way to the hospital. The paramedic asked Folkerte to follow the ambulance to the hospital, which he did a few minutes later, after he finished interviewing witnesses at the scene. Folkerte did not interview defendant at the accident scene, but Folkerte intended to interview defendant and also to issue him a traffic citation once Folkerte got to the hospital.

## B. *The Search of Defendant's Backpack at the Hospital*

The paramedics dropped defendant off at the hospital, a few minutes away. Defendant went in and signed a voluntary consent-to-treatment form before Folkerte arrived. Folkerte then entered defendant's treatment room and immediately smelled marijuana. That put defendant's concern about his backpack in context for Folkerte, who suspected that defendant possessed marijuana. During the exchange that followed, medical personnel filtered in and out of defendant's treatment room, and Folkerte stood next to defendant, who was in a chair. Folkerte testified that his tone was "[p]rofessional," that there was "nothing exceptional about" the "dialogue" that ensued, and that there were "no raised voices" or "unnecessary high emotions." Folkerte did not threaten to arrest defendant if he refused to cooperate.

Folkerte inquired whether the backpack contained marijuana, and defendant stated that it contained "a couple of pipes" and a "small amount of marijuana." Then, Folkerte asked defendant for consent to search his backpack, which defendant orally gave. Folkerte then read a department-prepared consent card to defendant, informing defendant that he had the right to refuse consent. Folkerte again asked defendant if he consented to the search and defendant again orally consented to the search. Defendant signed the card. Folkerte asked defendant to open his backpack and hand over the pipes and the "small amount of marijuana" that he had identified. While defendant complied, Folkerte could see that defendant was attempting to hide a brown wooden cigar box within the backpack. Folkerte asked defendant about the cigar box, which defendant removed from the backpack and opened to reveal two clear plastic bags containing marijuana, later weighed at 1.45 ounces. Folkerte questioned defendant again about any additional items in the backpack, and defendant removed a digital scale and a small pill container containing small amounts of crushed marijuana.

## C. *The Questioning After the Backpack Search*

After seeing the marijuana, scale, and pill container, and considering defendant's earlier request to drop off his

backpack, Folkerte suspected that defendant was delivering marijuana. Folkerte estimated that, at that point, about 20 minutes had passed since Folkerte had arrived at the hospital room. Folkerte read defendant his *Miranda* rights from a department-prepared card, and defendant stated that he understood his rights. Folkerte then began questioning defendant about delivering marijuana. Defendant stated that he delivered marijuana to friends who require it for medical purposes. Defendant also stated that he intended to sell the marijuana in his backpack to a friend and that he typically sold marijuana about once a week. Defendant admitted that he had last sold marijuana earlier that afternoon.

## D. *The Search of Defendant's Cell Phone*

At some point after questioning defendant about his marijuana dealing, Folkerte seized defendant's cell phone, although Folkerte could not remember how he acquired the phone or verified that it was defendant's. Based on defendant's statements and the evidence previously identified, Folkerte believed that he had probable cause to search defendant's text messages for evidence of marijuana dealing. He read defendant's text messages and identified text messages confirming that defendant had sold marijuana earlier in the day.

Folkerte issued defendant a criminal citation for the marijuana but did not take defendant into custody. Defendant, who was charged with delivery of marijuana for consideration and marijuana possession, then moved to suppress "any reference to, any evidence seized during, and any derivative evidence flowing from the search of defendant's [backpack]." The trial court denied defendant's motion, concluding that (1) defendant was not seized; (2) there was "probable cause throughout" to support the police officers' actions; (3) defendant voluntarily consented to the search of his backpack; and, (4) if defendant had been unlawfully seized, defendant's consent did not result from police exploitation of defendant's unlawful seizure. The trial court explained that the questioning that took place at the hospital "simply was an opportunity that occurred because of the police utilizing their community caretaking function.

There certainly was no intent for a criminal investigation when that request and direction [that defendant seek medical attention] was given." The trial court also addressed the lawfulness of the questioning at the hospital, stating that, "when the second officer got to the hospital room to give the citation for the incident that initiated all of this conduct, then the overwhelming smell of marijuana, as well as the information he had been given" before he contacted defendant resulted in a lawful investigatory process and "then a lawful consent process as well." The trial court also concluded that defendant's cell phone was lawfully seized and searched incident to his arrest.

## II. ANALYSIS

Defendant's arguments for suppression build upon the assumption that defendant was seized at the accident scene. Therefore, although we do not decide that issue, we summarize the parties' arguments to provide analytical context.

At the suppression hearing and in his brief on appeal, defendant argued that he was subject to ongoing police control from at least the moment that Riddle issued the ultimatum until Folkerte left the hospital. The state, on the other hand, frames defendant's interactions with Riddle and Folkerte as separate events. The state concedes that defendant's theory that he was seized at the accident scene "presents a close question, particularly in light of defendant's liberty interest in refusing medical treatment," and it notes cases from other jurisdictions addressing that issue. *See, e.g., Peete v. Metropolitan Government of Nashville*, 486 F3d 217, 219, 221-23 (6th Cir 2007) (local government paramedics did not unreasonably seize individual under the Fourth Amendment by physically restraining him to administer treatment for epileptic shock); *Green v. City of New York*, 465 F3d 65, 69-73, 83-84 (2d Cir 2006) (assuming that the jury accepted the plaintiffs' version of the facts, under the Fourth Amendment, police seized man with ALS who repeatedly communicated his intent not to be transported to the hospital, when an officer argued with the man's family about his need for medical assistance for more than an hour, his family constructed a barrier of furniture to prevent the police

from removing the man, an officer or a paramedic knocked down the man's wife to reach the man, and an officer said, "We are going to the hospital whether you like it or not."); *see also, e.g., Schreiner v. City of Gresham,* 681 F Supp 2d 1270, 1273, 1276 (D Or 2010) (woman experiencing diabetic shock was seized under the Fourth Amendment when a police officer tased her and handcuffed her to force her to submit to medical treatment). However, in the state's view, even if Riddle did seize defendant, that seizure ended before Folkerte arrived at the hospital and began his investigation.

As does the state, the trial court implicitly conceptualized defendant's interactions with Riddle and Folkerte as two separate events. We agree that Riddle's interaction with defendant should be analyzed separately from Folkerte's interaction with defendant, because any seizure by Riddle ended before Folkerte arrived at the hospital.

A "seizure" of a person occurs under Article I, section 9, "if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement" or "if a reasonable person under the totality of the circumstances would believe" that such a restriction has occurred. *State v. Ashbaugh,* 349 Or 297, 316, 244 P3d 360 (2010) (emphasis omitted). A seizure ends when a reasonable person under the totality of the circumstances would no longer believe that his or her liberty is being restricted. *See id.* at 317 (unlawful seizure ended when police returned the defendant's identification and told her that they were arresting her husband only).

In this case, even if Riddle seized defendant at the accident scene, that seizure ended, at the latest, when the paramedics dropped defendant off at the hospital and defendant signed a voluntary consent-to-treatment form. Defendant sought treatment with no police present, under normal circumstances at the hospital. Neither of the officers at the accident scene communicated to defendant that he intended to follow defendant to the hospital. By the time defendant was being transported, Riddle, the officer with whom defendant had directly interacted, had left the accident scene, and he did not interact with defendant again.

And, Folkerte did not follow directly behind the ambulance on its way to the hospital, but instead left for the hospital a few minutes after the ambulance had left the accident scene. He arrived at the hospital after defendant had made the choice to receive medical treatment. A reasonable person, under the totality of the circumstances, would not have felt that he or she was subject to ongoing police control at the time that defendant entered the hospital and sought medical treatment.

## A. *Defendant's Consent to Search*

As previously noted, the trial court concluded that Folkerte had a separate lawful justification to question defendant at the hospital. Defendant does not specifically challenge that conclusion on appeal. Instead, he argues that the physical evidence found in his backpack should be suppressed because, even though he voluntarily consented to Folkerte's search of the backpack, his consent resulted from police exploitation of his earlier illegal seizure by Riddle at the accident scene and Folkerte's alleged continuation of that seizure.[1] Thus, even though we have determined that any unlawful seizure (if there was one) had ended at the time that defendant entered the hospital, we nonetheless must address defendant's argument that Folkerte exploited that allegedly unlawful seizure to obtain defendant's consent to the search of his backpack. We reject that argument.

A defendant's consent to search is a well-recognized exception to the warrant requirement under Article I, section 9. *See, e.g., State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994). However, evidence obtained pursuant to a consent search may still be suppressed if the police exploited their prior misconduct to obtain the evidence. *State v. Unger*, 356 Or 59, 86, 333 P3d 1009 (2014). Whether evidence

---

[1] Defendant also argues on appeal that he restricted the scope of consent to search his backpack by shielding the cigar box inside of it from view. That argument is not preserved because defendant did not raise it at trial, and, therefore, we do not address it. *See State v. Pickle*, 253 Or App 235, 244-45, 288 P3d 1039 (2012), *rev den*, 353 Or 428 (2013) (arguments concerning the scope of consent must be developed specifically before the trial court and are distinct from arguments concerning whether consent was given).

"obtained pursuant to a consent search must be suppressed involves three overlapping issues: (1) whether the initial stop or search was lawful; (2) whether the defendant's consent to the subsequent search was voluntary; and (3) assuming that the initial stop or search was unlawful and the consent to the subsequent search was voluntary, whether the police exploited the illegality to obtain the disputed evidence."

*Id.* at 70-71. This case presents the third issue. We conclude, as did the trial court, that, if Riddle had unlawfully seized defendant, the state established that defendant's voluntary consent was only tenuously related to that seizure and the police did not exploit the seizure to obtain his consent to search his backpack.

Under an exploitation analysis, "the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 69 (internal quotation marks and citation omitted). Exploitation analysis "require[s] consideration of the totality of the circumstances," *id.* at 86, including

"the proximity of the consent to the arrest, whether the seizure brought about police observation of the particular object which they sought to search, whether the illegal seizure was 'flagrant police misconduct,' whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to consent * * *, whether there has been a significant intervening event * * *, and whether the police purpose underlying the illegality was to obtain the consent[.]"

*Id.* at 87 (quoting Wayne R. LaFave, 4 *Search and Seizure* § 8.2(d), 109-12 (5th ed 2012) (footnotes omitted)). The factors, on the whole, look to whether the police used unlawful conduct to gain an advantage over the defendant.

Applying the analysis first to Riddle's conduct, Riddle's community-caretaking purpose strongly suggests that, even if he did unlawfully seize defendant, the police did not use that conduct to gain an advantage over defendant. *See State v. Lorenzo*, 356 Or 134, 145, 335 P3d 821 (2014) (finding no police exploitation, in part because the police went to the defendant's apartment in response to a

threatened suicide, with no intent to ask for consent to search the apartment). Riddle did not intend to obtain consent to search defendant's backpack for marijuana or to investigate defendant for criminal activity at all. Far from engaging in the "flagrant police misconduct" that would signal exploitation, Riddle repeatedly asserted that he believed only that he was fulfilling a "moral obligation" and a community-caretaking function by helping an injured "kid."

We also conclude that Folkerte's entire encounter with defendant is a significant intervening event that attenuated any potential prior police illegality. An intervening lawful stop can sufficiently attenuate an unlawful seizure from evidence later discovered. *State v. Lay*, 242 Or App 38, 49, 252 P3d 850 (2011). That occurred in this case. When Folkerte arrived at defendant's hospital room, he immediately smelled the "overwhelming smell of marijuana," which gave him an independent basis to question defendant about possible criminal behavior. *See State v. Vennell*, 274 Or App 94, 99, 359 P3d 1255 (2015) (a strong smell of marijuana attributable to a defendant supports reasonable suspicion to justify an investigatory stop). Although the trial court did not expressly identify the strong smell of marijuana in terms of reasonable suspicion or Folkerte's questioning of defendant as a seizure, the court concluded that the smell, coupled with the information Folkerte had received from the paramedics, began a "lawful consent process."

As a factual matter, the trial court rejected the possibility that Folkerte had purposefully created an encounter with defendant at the hospital to take advantage of any seizure of defendant by Riddle. The trial court found that Folkerte did not have an insidious purpose in issuing the citation at the hospital rather than at the accident scene. The record supports that finding. Defendant was injured, the hospital was only a few minutes away, and Folkerte completed his investigation by interviewing witnesses at the accident scene before leaving for the hospital. Although the information from the paramedics led Folkerte to begin to suspect, before he arrived at the hospital, that the backpack contained contraband, Folkerte had an unrelated and legitimate reason to be at the hospital: to issue the traffic citation to defendant.

Finally, Folkerte informed defendant that he did not have to consent to the search, which helped to attenuate defendant's consent from any previous illegal conduct that may have occurred. Informing a defendant that he does not have to consent to a search can be a mitigating event in the exploitation analysis. *Unger,* 356 Or at 87; *State v. Hinds,* 225 Or App 470, 475-76, 202 P3d 187, *rev den,* 347 Or 43 (2009). Here, defendant was informed of his choice not to consent, and Folkerte gave defendant multiple opportunities to refuse the search. Before the search, Folkerte orally asked for defendant's consent, read him the standard department consent card, which expressly stated that defendant did not have to consent, orally asked for his consent again, and had him sign the consent card. Folkerte's explanations that defendant had a choice and the procedural thoroughness with which Folkerte obtained defendant's consent helped to mitigate any unlawful police advantage over defendant.

Based on the totality of the circumstances— including that Riddle had a noninvestigative, community-caretaking purpose to interact with defendant; defendant chose to seek medical treatment once he was dropped off at the hospital when no police were present; Folkerte had an independent lawful basis to question defendant about marijuana possession; and Folkerte fully informed defendant that he could refuse consent—we conclude that the state met its burden to prove that defendant's consent was sufficiently attenuated from any preceding unlawful police conduct that may have occurred. Therefore, we conclude that the trial court did not err in admitting the physical evidence seized as a result of a lawful consent search of defendant's backpack.

B. *Defendant's Statements After He Was Advised of His* Miranda *Rights*

Defendant argues that his inculpatory statements about drug sales must be suppressed because of preceding illegal police conduct, for the following two reasons: (1) he received late and ineffective *Miranda* warnings, and (2) Folkerte exploited Riddle's unlawful seizure. To set the first argument's foundation, defendant contends that Folkerte should have issued him *Miranda* warnings when

starting to question him at the hospital, because the hospital environment was "compelling." Therefore, he argues, the police violated his right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution. *See State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007) (police must give *Miranda*-like warnings when a person is subject to custodial interrogation or interrogation in circumstances that a reasonable person would understand as compelling). As a result, defendant asserts, his post-*Miranda* statements must be suppressed because the belated *Miranda* warnings were ineffective under *State v. Vondehn*, 348 Or 462, 467, 236 P3d 691 (2010). Second, defendant argues that his post-*Miranda* statements must be suppressed because they resulted from police exploitation of Riddle's alleged unlawful seizure. In defendant's view, Folkerte's eventual *Miranda* warnings were insufficient to attenuate defendant's statements from that unlawful conduct. *See State v. Ayles*, 348 Or 622, 636-37, 237 P3d 805 (2010) (framing that argument). We reject both arguments.

For clarity, we note that defendant made some incriminating statements to Folkerte before and after he received *Miranda* warnings, and the pre- and post-*Miranda* statements raise different legal issues. Before the warnings, Folkerte questioned defendant about his backpack, and defendant stated that the backpack contained marijuana. Those statements would be properly suppressed under an Article I, section 12, theory if they were the direct result of an interrogation that violated defendant's Article I, section 12, rights. *See State v. Roble-Baker*, 340 Or 631, 643-44, 136 P3d 22 (2006) (confession in response to unwarned interrogation under compelling circumstances should have been suppressed). After the warnings, defendant stated that he was selling drugs. Those statements would be properly suppressed under an Article I, section 12, theory only if the eventual *Miranda* warnings were legally ineffective due to an earlier *Miranda* violation. *See Vondehn*, 348 Or at 467 ("[A] trial court must exclude [a] defendant's warned post-*Miranda* statements unless the state establishes that, considering the totality of the circumstances, when the police belatedly administer *Miranda* warnings, they effectively and accurately informed the defendant of his or her

Article I, section 12 rights."). Below, defendant apparently sought to suppress all of his statements to Folkerte in the hospital room, including the pre-*Miranda* statements. On appeal, however, defendant appears to assign error only to the trial court's ruling admitting his post-*Miranda* statements, and, therefore, we address only that issue.

We reject defendant's initial premise that he was in compelling circumstances when Folkerte initially questioned him in the hospital room, and that, therefore, Folkerte violated his Article I, section 12, rights by not issuing him *Miranda* warnings at that point. "[I]n determining whether the police placed a defendant in compelling circumstances, this court will consider all the circumstances, and its overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. That inquiry "turns on how a reasonable person in the suspect's position would have understood his or her situation." *Shaff*, 343 Or at 645. Factors relevant to that inquiry include, among others, "'the location of the encounter,'" "'the defendant's ability to terminate the encounter,'" "'the amount of pressure exerted on the defendant,'" and "'the length of the encounter.'" *Id.* (quoting *Roble-Baker*, 340 Or at 640-41).

Here, under all of the circumstances, a reasonable person in defendant's position would not have understood himself to be in compelling circumstances. First, a hospital setting is not, in and of itself, a compelling environment. *State v. Warner*, 181 Or App 622, 629, 47 P3d 497, *rev den*, 335 Or 42 (2002). *Cf. State v. Foster*, 303 Or 518, 528, 739 P2d 1032 (1987) (analyzing whether incriminating statements made in a hospital were involuntary). Second, although we acknowledge that defendant was not free to *leave* the encounter if he wanted to wait for medical treatment, that does not mean that defendant was not free to terminate the encounter. In fact, Folkerte gave defendant multiple opportunities to do so when Folkerte informed him that he did not have to consent to the search of his backpack. Further, defendant's decision to remain was not due to police conduct; rather, defendant was waiting for medical treatment to which he had voluntarily consented. *See*

*Warner,* 181 Or App at 629 (hospital setting was not compelling, in part, because the injured DUII "defendant's inability to leave was not the product of police conduct; rather, he had been immobilized by medical personnel for medical reasons"). Third, Folkerte's tone was "professional," and he did not threaten to arrest defendant for refusing to consent to the search of the backpack. That suggests that Folkerte did not exert extreme pressure on defendant. *Cf. State v. Coen,* 203 Or App 92, 101, 125 P3d 761 (2005), *rev den,* 341 Or 141 (2006) (distinguishing *Warner* and holding that hospital setting was compelling, in part, because the police officer told the defendant that he could be arrested for refusing to cooperate with questioning). Finally, Folkerte's 20-minute investigation was not so lengthy as to become coercive, in light of the fact that he repeatedly gave defendant the option to terminate the encounter.

In sum, the circumstances as a whole would not indicate to a reasonable person that he had no choice but to answer Folkerte's questions. Therefore, we conclude that defendant was not in compelling circumstances during his initial interaction with Folkerte at the hospital. And, therefore, Folkerte was not required to issue defendant *Miranda* warnings at that point. As a result, we do not reach defendant's argument regarding the effectiveness of the *Miranda* warnings that he ultimately received.

For the same reasons that we concluded that Folkerte's search of defendant's backpack did not result from police exploitation of prior illegalities, we reject defendant's exploitation argument regarding his statements. Even assuming that defendant was unlawfully seized at the accident scene, that seizure had ended by the time of his interaction with Folkerte. In addition, Folkerte issued defendant *Miranda* warnings before questioning him about drug sales, reading them from a department-prepared card. Like Folkerte's explanation of defendant's right to refuse consent to search, the *Miranda* warnings notified defendant that he did not have to speak to the police and served to mitigate the taint of any preceding unlawful seizure. *Cf. Ayles,* 348 Or at 638-39 (*Miranda* warnings concurrent with the defendant's arrest were ineffective to attenuate an illegal seizure that led to an illegal search that led to the arrest).

Accordingly, we conclude that the trial court did not err in denying defendant's motion to suppress as to his statements regarding drug sales.

## C. *Seizure and Search of Defendant's Cell Phone*

The Oregon and federal search incident to arrest doctrines are independent exceptions to the warrant requirements under Article I, section 9, and the Fourth Amendment. The trial court concluded that defendant's cell phone was lawfully seized and that Folkerte's warrantless search of defendant's text messages was lawful as a search incident to a lawful arrest. Defendant argued to the trial court that both Article I, section 9, and the Fourth Amendment required suppression of the text messages, and renews both arguments on appeal. Federal law concerning police officer searches of cell phone data has developed since defendant appealed, and it is now apparent, based on *Riley*, ___ US at ___, 134 S Ct at 2493, that the court erred in admitting the text messages under the Fourth Amendment's search incident to arrest exception to the warrant requirement.

After oral argument in this case, the United States Supreme Court held in *Riley* that the search incident to arrest exception under the Fourth Amendment categorically does not apply to digital data stored on cell phones. ___ US at ___, 134 S Ct at 2494. Defendant supplied a memorandum of additional authorities, arguing that, under *Riley*, he prevails under the Fourth Amendment.[2] Neither party

---

[2] The state responds that defendant cannot rely on *Riley* because (1) defendant conceded in the trial court that the search incident to arrest exception applies to cell phone data and, therefore, invited the error; and (2) defendant waived the argument on appeal by raising it for the first time in his memorandum of additional authorities. We reject both arguments. First, the invited error doctrine prevents a party from later assigning error to a ruling when that party "has invited the trial court to rule in a particular way, under circumstances that suggest that the party will be bound by the ruling or at least will not later seek a reversal on the basis of it." *State v. Ferguson*, 201 Or App 261, 270, 119 P3d 794 (2005), *rev den*, 340 Or 34 (2006). Here, defendant did not concede that the search incident to arrest doctrine applies to cell phone data; rather, he insisted that Folkerte needed an additional justification such as exigency to search the contents of the cell phone, and he argued, in the alternative, that if the trial court relied on the search incident to arrest exception, then the state had not proved that the exception applied in this case. Second, in his opening brief, defendant *did* argue that the search incident to arrest exception did not apply to the search of his text messages, and *Riley* issued after he filed his opening brief. Therefore, he did not waive that argument. *See* ORAP 5.45(1).

has briefed whether Article I, section 9, compels a different result.

Ordinarily, the "first-things-first" doctrine directs us to resolve state constitutional law claims before reaching federal law claims. *State v. Babson*, 355 Or 383, 432-33, 326 P3d 559 (2014) (acknowledging without accepting or rejecting an argument that we may not be *required* to resolve state law claims first, but observing that, at the very least, there are "sound [policy] reasons for doing so"); *State v. Babson*, 249 Or App 278, 307 n 6, 279 P3d 222 (2012), *aff'd*, 355 Or 383, 326 P3d 559 (2014) (stating that, until the Supreme Court repudiates the first-things-first doctrine, we will generally choose to follow it). However, "in some instances, where a rights claimant obviously prevails under the federal constitution regardless of whether the state law vindicates the claim, we will, as a matter of judicial efficiency, decide the case under the federal constitution without treating the state law issue." *Babson*, 249 Or App at 307 n 6.

As a matter of judicial efficiency, we decide defendant's challenge to the admission of the text messages from his cell phone under the Fourth Amendment. We conclude that the trial court erred by admitting the text messages, because it incorrectly reasoned that the warrantless search of defendant's cell phone was valid under the federal search incident to arrest doctrine. We so conclude based on only federal law for three reasons.

First, the Court's holding in *Riley* could not be clearer: "[A] warrant is generally required before" a search of data on a cell phone, "even when a cell phone is seized incident to arrest." ___ US at ___, 134 S Ct at 2493. Second, the parties have not briefed how we should interpret Article I, section 9, as it applies to warrantless searches of cell phone data. And third, although we might in other circumstances ask the parties to brief the state constitutional issue, *see State v. Kennedy*, 295 Or 260, 268, 666 P2d 1316 (1983) (stating that, "[w]hen a court is confronted with a mere unexplained citation of an Oregon source tacked on as an 'afterthought,' * * * the court * * * may request counsel either to explain the claim under state law or to abandon it"), such briefing would be an inefficient use of the parties'

and our resources. Our disposition would ultimately be the same, even if we were to prolong this appeal by requiring the parties to brief the state constitutional grounds. Therefore, in the interest of judicial efficiency and a final resolution of this case, we address only defendant's Fourth Amendment authorities and conclude that the trial court erred in admitting the text messages.

D. *Harmless Error Analysis*

Defendant's conviction was based on a conditional guilty plea entered pursuant to ORS 135.335(3). That statute provides:

> "With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

Defendant argues that, in appeals based on conditional pleas, we do not engage in a harmless error analysis. Thus, defendant argues, he may decide on remand whether to withdraw his plea and go to trial. We agree. *See, e.g., State v. Dinsmore*, 182 Or App 505, 519, 49 P3d 830 (2002) (holding that employing a harmless error analysis when a defendant enters a conditional plea and reserves the right to appeal "would defeat that statutory right").

## III. CONCLUSION

In summary, we conclude that the trial court did not err in denying defendant's suppression motion as to the physical evidence seized from defendant's backpack or as to defendant's statements. In light of *Riley*, however, we conclude that the trial court erred in denying defendant's motion to suppress the text messages from defendant's cell phone based upon the search incident to arrest exception to the warrant requirement under the Fourth Amendment.

Reversed and remanded.