Argued and submitted September 28, 2010, affirmed April 6, 2011

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# CONAN QUINCY LAY,
*Defendant-Appellant.*

Washington County Circuit Court
C081500CR; A140702

252 P3d 850

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Defendant was tried and convicted for possession of methamphetamine. ORS 475.894. On appeal, he assigns error to the trial court's denial of his motion to suppress evidence obtained from what he contends was an unlawful stop. We conclude that defendant was unlawfully stopped, but that the connection between that unlawful stop and the discovery of the disputed evidence—an inculpatory statement by defendant—was sufficiently attenuated to negate the need for suppression. We therefore affirm.

Although some key facts were disputed at the motion to suppress hearing, the trial court resolved those disputes in favor of the state; the findings are supported by evidence in the record, so we are bound by them. *State v. Vasquez-Villagomez*, 346 Or 12, 23, 203 P3d 193 (2009). Those facts are as follows. Just after 2:00 a.m., Tigard Police Officer Powers stopped a minivan because its license plate light was burned out. When he contacted the driver, Powers noticed that her pupils were dilated, that her speech was excited, and that both the driver and defendant, a passenger in the van's front seat, "could not stop fidgeting[.]" Powers asked the driver whether she was on any medication at that time, and she replied that she had taken Vicodin before driving. Powers asked for and obtained a driver's license from the driver; he also "asked defendant * * * if he had any issues, if I could see his driver's license, just so I knew who I was talking to." Defendant handed the officer his driver's license and, while standing "a few steps" from the van but "very close," Powers radioed dispatch, recited both license numbers, and "had dispatch run them real quick for warrants and * * * driving status[.]" Less than a minute after taking the licenses and before receiving any response from dispatch, Powers returned the licenses and said, "Thank you for your cooperation." He then directed his attention to the driver, asking her to step out of the van.

Once the driver was out of the van, Powers asked her whether she had taken any drugs in addition to the Vicodin, and she informed him that she and defendant had smoked methamphetamine earlier that night. When asked if there were drugs in the van, the driver said that there was a pipe,

but that she did not know if there was any methamphetamine. She then agreed to allow Powers to search the entire vehicle.

During the time that Powers was talking with the driver outside the vehicle, a backup officer, Lain, arrived at the scene. Having been informed by Powers that defendant and the van's driver were under the influence of methamphetamine, Lain approached the passenger side of the vehicle and addressed defendant, who appeared nervous and jittery. Based on that appearance and the information that he had received from Powers about defendant's earlier activities, Lain believed that defendant was under the influence of methamphetamine. In addition, Lain testified that, in light of those circumstances, based on his training and experience, he suspected that there would be drugs in the vehicle or on defendant's person.

Lain asked defendant if he would mind stepping out of the vehicle to talk, and defendant complied. In response to a question from Lain, defendant disclosed that he had a knife in the pocket of his jacket. Lain asked if he could take the weapon during their conversation, and defendant raised his arms in the air while Lain removed a "five-inch double-edged dagger" from the jacket pocket and placed it on the hood of the van. The officer also asked defendant if he had been arrested for a felony, and defendant said that he had. At that point, Lain developed the belief that defendant was violating laws against being a felon in possession of a weapon and carrying a concealed weapon. Thereafter, defendant consented to a search of his person and belongings. Lain conducted that search and did not find anything illegal.

Powers then informed Lain that the driver had consented to a search of the vehicle. After confirming that consent with the driver, Lain conducted the search and found a black zippered toiletry bag with a flowered print. Inside the bag, he found a pipe along with a blue plastic Q-Tip travel pack, which, in turn, contained a baggie of methamphetamine. Lain placed those items on the hood of the van, at which point defendant immediately and spontaneously stated that the drugs were his and did not belong to the driver. Defendant's statement occurred nearly 30 minutes

after Powers initially took and ran defendant's identification. After being informed of his *Miranda* rights, defendant again stated that, even though it was in the driver's bag, the methamphetamine was his. Defendant was ultimately charged with possession of methamphetamine. He was not charged with any weapon-related crimes, and the driver was not charged with driving under the influence of intoxicants or, for that matter, with anything else; indeed, although defendant was arrested, the driver and the other passenger were allowed to leave the scene.

In a pretrial motion, defendant sought suppression of his statements acknowledging ownership of the methamphetamine; he clarified at the hearing that he did not seek suppression of the methamphetamine itself. He contended that, when Powers took his license and radioed dispatch, he was seized without reasonable suspicion and that, because neither Powers nor Lain ever informed him that dispatch had reported that there was no reason to detain him, the seizure continued throughout the encounter. For that reason, defendant argued, his incriminating statements were the result of an unlawful stop and therefore, suppression was required. The state conceded that the officer stopped defendant by taking his identification but argued that the stop ended when, "after one minute," the license was returned. The state emphasized that the officers ultimately found the "drugs based on somebody else's consent, and the defendant on his own admit[ted], 'Those are my drugs.'" The state also maintained that, to the extent that the taint of the original stop survived the return of the license, the causal link between the original stop and defendant's statements was broken, or at least attenuated, by subsequent, superseding, *lawful* seizures: first, the seizure that occurred when Lain asked defendant to step out of the van, which was supported by Lain's reasonable suspicion that there were drugs either on defendant's person or in the vehicle; and second, the seizure that occurred when Lain discovered that defendant was unlawfully carrying a concealed weapon. The court agreed with the state and denied defendant's motion to suppress. Before this court, the parties essentially renew the arguments that they made before the trial court.

Like many cases involving motions to suppress under Article I, section 9, of the Oregon Constitution, this case presents three fundamental questions: (1) When, if ever, was defendant stopped? (2) At the time of the stop, did the police have reasonable suspicion of criminal activity? (3) If not, and the stop was for that reason unlawful, was the connection between the unlawful stop and the discovery of the disputed evidence sufficient to require suppression?

These questions are governed by several legal principles, most of which are easier to state than to apply. For purposes of Article I, section 9, a stop occurs: "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (footnote omitted; emphasis in original).

To be lawful, a warrantless stop must be supported by a reasonable suspicion of criminal activity. *State v. Hall*, 339 Or 7, 17, 115 P3d 908 (2005). A police officer "reasonably suspects" criminal activity if he or she "holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts * * *." ORS 131.605(5). "A law enforcement officer has reasonable suspicion and, thus, is permitted to stop an individual for investigation, if the officer can point to specific and articulable facts that gave rise to the officer's suspicion[.]" *State v. Nguyen*, 176 Or App 258, 262, 31 P3d 489 (2001). The state bears the burden of proving the facts that justify an exception to the warrant requirement. ORS 133.693(4); *see also State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000). To establish the requisite connection between an unlawful seizure and disputed evidence, a defendant must establish the existence of a minimal factual nexus—that is, the existence of a "but for" relationship—between the unlawful police conduct and the evidence at issue. *See Hall*, 339 Or at 35. Once a defendant establishes that nexus, the "state has the burden to prove that the [evidence] was independent of, or only tenuously related to, the unlawful police conduct." *Id.*

■  Applying those precepts to the facts in this case, we conclude, first, that defendant was stopped when Powers took his driver's license and that the stop continued throughout the entire encounter. When an officer conducting a traffic stop takes and retains a passenger's identification, the passenger is considered to have been seized for purposes of Article I, section 9. *State v. Ayles*, 348 Or 622, 628, 237 P3d 805 (2010); *see also State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) (officer seized passenger where the officer asked for passenger's identification and retained it for less than five minutes to perform a records check); *Hall*, 339 Or at 19 (officer seized the defendant by taking the defendant's identification card and radioing the police dispatch for a warrant check). That is particularly true when the identification is a driver's license; a reasonable person would not feel free to abandon that indispensable piece of identification.

■  Furthermore, a stop does not necessarily end when the officer returns a person's identification; whether it does or does not depends on the surrounding circumstances. *State v. Highley*, 219 Or App 100, 109, 180 P3d 1230 (2008), *rev allowed*, 350 Or 130 (2011). The most important circumstance appears to be whether, upon returning the identification, the officer indicates that the investigation has ended. Thus, in *Hall*, 339 Or at 19, the Supreme Court held that, even though the officer "promptly returned defendant's identification card," the defendant remained seized because he was aware that a warrant check was being run; the seizure continued because the officer who was conducting the investigation did nothing to indicate to the defendant that the warrant check had come back negative, thereby "dispel[ling] what would have been an objectively reasonable belief that defendant was restrained from leaving[.]" *Accord Highley*, 219 Or App at 109-10; *State v. Rider*, 216 Or App 308, 172 P3d 274 (2007).

■  In the present case, when Powers first reached the van, he questioned the driver about drugs and she acknowledged driving after having taken Vicodin, a prescription medication. Powers requested and obtained defendant's driver's license after asking him if he "had any issues[.]" Standing only a "few steps away" from the car—"very close to

it," clearly within earshot of the car's occupants—he radioed dispatch and requested a warrant check. Almost immediately ("a few seconds" later), he returned the license. As he did, he said, "Thank you for your cooperation." He then asked the driver to step out of the van and began to interrogate her. Meanwhile, another officer arrived and began to question defendant. We conclude that, under the totality of the circumstances, requesting defendant's license and ordering a warrant check initiated a stop. Powell returned the license almost immediately and did nothing to indicate that the warrant check had come back clear, notwithstanding his ambiguous statement thanking defendant for his cooperation. Under the circumstances, a reasonable person would have concluded that he remained the subject of a criminal investigation.

■■ We also conclude that, at the time, Powell did not have reasonable suspicion that defendant was involved in criminal activity. Reasonable suspicion has both a subjective and an objective component; it "requires a subjective belief by the police officer that the person has committed a crime or is about to commit one[.]" *State v. Hitchcock / Winters,* 224 Or App 77, 86, 197 P3d 33 (2008) (citing ORS 131.605(5) and *State v. Ehret,* 184 Or App 1, 7, 55 P3d 512 (2002)). Powell never testified that he had any suspicion of criminal activity by defendant at the time he asked for the license; he testified, in fact, that he took defendant's license "just so I knew who I was talking to, and the fact that he was a witness" to the traffic violation. The stop was unlawful.

■ However, it did not remain unlawful for long. Minutes after Powell returned defendant's license, the officer learned that defendant and the driver had recently smoked methamphetamine. Powell passed that information along to the newly arrived Officer Lain. Lain testified that, based on his training and experience, he knew that people who are under the influence of narcotics frequently carry either narcotics or paraphernalia on their person or in their car. Based on that fact, combined with defendant's appearance ("jittery, nervous, twidgitty"), Lain developed a suspicion that defendant might be carrying contraband. Lain therefore asked defendant to step out of the van.

■    The state concedes that that request amounted to a seizure, and we agree. Under the circumstances, a reasonable person in defendant's position would not believe that he had the option of refusing Lain's "request." The state contends, however, that the seizure was lawful because Lain had reasonable suspicion in light of his training and experience and based on his observation of defendant coupled with the information that Powell provided.

In many cases, the knowledge that an officer claims to have acquired from training and experience reflects common sense, and in other cases the knowledge is "more esoteric, specialized, counter-intuitive, or scientific[.]" *State v. Daniels*, 234 Or App 533, 542, 228 P3d 695, *rev den*, 349 Or 171 (2010). When the knowledge reflects common sense, we do not require extensive elaboration of the training and experience from which it derived in order to give that training and experience persuasive weight. *Id.* The knowledge that Lain claimed to have learned in his experience is hardly esoteric: People who are under the influence of drugs are likely to be carrying drugs or drug paraphernalia. Thus, no elaborate recitation of his experience was necessary in order to imbue his claimed knowledge with logical force. In fact, Lain testified that his experience consisted of a year as a full-time undercover narcotics officer dealing with heroin and methamphetamine and that his job was to "immerse" himself into users' "culture and gather information and purchase narcotics from these individuals." That testimony sufficiently establishes the persuasive weight of his experience and what it taught him: that defendant was likely to have drugs on his person or in the van. We therefore agree with the state that the additional stop (asking defendant to step out of the van), effected in order to prove or disprove that suspicion, was lawful.

■    The remaining question, then, is this: Is the logical connection between the *unlawful* stop and defendant's admissions that the methamphetamine belonged to him sufficient to require suppression? We refer to "admissions" in the plural, because there were two. The first occurred before defendant received *Miranda* warnings and the second occurred afterward. We take them up in turn.

As noted above, to establish the requisite connection between an unlawful seizure and disputed evidence, a defendant must establish the existence of a minimal factual nexus—that is, the existence of a "but for" relationship—between the unlawful police conduct and the evidence at issue. *Hall*, 339 Or at 34-35. Once a defendant establishes that nexus, the "state has the burden to prove that the [evidence] was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 35. Defendant argues that, because his inculpatory statement occurred *during* an unlawful seizure, there is no need to establish a "but for" connection between the two events. The state responds that the direct "but for" causal relationship was broken by the occurrence of the *lawful* search of the van pursuant to the driver's consent.

The state's argument is foreclosed by *Ayles*, 348 Or at 622, a case with some remarkable similarities to this one. In *Ayles*, as here, the defendant was a passenger in a vehicle that a police officer stopped for a traffic infraction. While questioning the driver, whom he suspected of being under the influence of methamphetamine, the officer asked the defendant for his identification. After running a warrant check that came back negative, the officer asked the defendant to step out of the vehicle; he then asked for, and received, consent to pat him down. The patdown led to the discovery of contraband. The officer then gave the defendant *Miranda* warnings, after which the defendant further incriminated himself. *Ayles*, 348 Or at 624-26. The state argued that, because the unlawful stop (retaining the defendant's identification) was followed by a lawful search (based on the defendant's voluntary consent), the but-for connection was severed. *Id.* at 630. Emphasizing that the lawful search occurred while the "illegal seizure" was *"ongoing,"* *id.* at 631 (emphasis in original), the court rejected the state's argument:

> "[W]e conclude that defendant met his burden to establish a minimal factual nexus between the illegal police conduct and his consent to search. During defendant's unlawful seizure, defendant was not free to leave. The unlawful police conduct thus made defendant available to [the police officer] for questioning. Although the state asserts that, as a practical matter, defendant would have remained at the

scene regardless of the illegal seizure (because his driver had been lawfully stopped and the location of the stop was somewhat remote), the state has pointed to no evidence in the record that defendant would not have left had he not been illegally detained. * * * Whether or not defendant would have asserted his personal liberty and left the scene once his identification was returned to him, we cannot conclude that the illegal seizure of defendant, *while it was ongoing*, had no factual nexus to defendant's decision to consent. A defendant gains nothing from having a constitutional right not to be seized if the police can seize him and—by definition—use the circumstance of that seizure as a guarantee of an opportunity to ask him to further surrender his liberty. There was a minimal factual nexus between defendant's illegal seizure and his decision to consent."

*Id.* at 631-32 (emphasis in original). It is true that there are some factual differences between *Ayles* and this case—in *Ayles* the police did not return the defendant's identification, and the unlawful seizure in *Ayles* was followed by a consent search as opposed to a lawful seizure based on reasonable suspicion. Those differences, however, do not limit the court's holding: a lawful search or seizure that occurs during an ongoing unlawful seizure and leads to the discovery of incriminating evidence does not normally break the but-for chain of causation between unlawful police conduct and the evidence.

■ That conclusion, however, simply shifts the burden to the state to show that the discovery of the disputed evidence was "independent of, or only tenuously related to, the unlawful police conduct." *Hall*, 339 Or at 35.[1] To determine whether the state has made that showing

"requires a fact-specific inquiry into the totality of the circumstances * * *. * * * Although determining the existence

---

[1] The court in *Ayles* expressly avoided confronting that issue, explaining that the state had relied entirely on the argument that there was no but-for connection. 348 Or at 630 n 3 ("[T]he state did not argue below, and does not argue in this court, that, if defendant had not established the requisite minimal nexus, the state did or could meet its burden to prove that defendant's consent (and the consequent discovery of the prescription pill bottle containing methamphetamine) was independent of, or only tenuously related to, the unlawful police conduct.").

of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's [statement], (2) the existence of any intervening circumstances, and (3) the presence of any circumstances * * * that mitigated the effect of the unlawful police conduct."

*Id.* (footnote omitted).

Here, defendant's initial statement that the drugs in the car were his occurred nearly 30 minutes after Powers obtained and ran defendant's driver's license, returned the license, and thanked defendant for his cooperation. Thus, the "temporal proximity" between initiation of the stop and defendant's statement was not close. In addition, several "intervening circumstances" serve to attenuate the stop from the statements. First, as discussed above, an intervening lawful stop occurred. Second, the drugs at issue were discovered as the result of an undisputedly lawful search based on the consent of the driver of the vehicle. That search was entirely independent of the unlawful stop—it was not based on any information acquired from the taking of defendant's identification and would have occurred even in the absence of the stop of defendant. Finally, we think it particularly significant that, without prompting of any kind from the officers, defendant volunteered the statements which are the evidence at issue. *See State v. Ayles*, 220 Or App 606, 616, 188 P3d 378 (2008), *aff'd*, 348 Or 622, 237 P3d 805 (2010) (whether information is volunteered spontaneously, without police prompting, bears on attenuation from unlawful police conduct). Immediately after seeing the drugs that were discovered in the vehicle, defendant made the unsolicited statement that the drugs were his. The unsolicited nature of the statement, taken together with the other intervening circumstances, convinces us that the evidence at issue was sufficiently attenuated from the unlawful stop. Further, because the chain of causation between the un-*Mirandized* statements and the unlawful seizure was too attenuated to justify suppression, *a priori* the connection between the subsequent *Mirandized* statement was as well. Accordingly, we conclude that the state met its burden to show that both statements

were so tenuously related to the unlawful conduct that suppression was not required.

Affirmed.