Argued and submitted December 2, 2021, reversed and remanded
November 16, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GREGGORY LEE ORMAN,
*Defendant-Appellant.*

Lincoln County Circuit Court
19CR13889; A171638

521 P3d 506

Defendant appeals his convictions on seven counts of identity theft, ORS 165.800, one count of second-degree forgery, ORS 165.007, and one count of unlawful possession of heroin, ORS 475.854(2)(a). He argues that the trial court erred when it denied his motion to suppress evidence discovered during a warrantless search of his bag during a traffic stop in which he was a passenger in the car. He asserts that he was unlawfully stopped and thus the evidence discovered was tainted by the illegal seizure. *Held*: The Court of Appeals concluded that, given the totality of the circumstances, a reasonable person in defendant's position would understand that they had been stopped as a matter of law. The court further concluded that the stop occurred prior to the development of reasonable suspicion. Accordingly, all evidence discovered as a result of the unlawful stop was tainted. The trial court therefore erred in denying defendant's motion to suppress.

Reversed and remanded.

Sheryl Bachart, Judge.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Mooney, Presiding Judge, and Hellman, Judge, and DeVore, Senior Judge.*

HELLMAN, J.

Reversed and remanded.

_____
* Hellman, J., *vice* DeHoog, J. pro tempore.

**HELLMAN, J.**

Defendant appeals his convictions on seven counts of identity theft, ORS 165.800, one count of second-degree forgery, ORS 165.007, and one count of unlawful possession of heroin, ORS 475.854(2)(a), based on a conditional guilty plea, pending this appeal. Defendant filed a motion to suppress evidence discovered during a warrantless search of his bag during a traffic stop in which he was a passenger in the car, arguing that he was unlawfully stopped and thus the evidence discovered was tainted by the illegal seizure. The trial court concluded that the stop of the car was lawful and that the evidence was admissible under three different exceptions to the warrant requirement: consent, the automobile exception, and search-incident-to-arrest. We hold that the trial court erred in denying the motion to suppress, as defendant himself was illegally stopped prior to the search of his bag and the state failed to meet its burden of proving that the discovered evidence was nonetheless admissible. Accordingly, we reverse and remand.

## FACTUAL BACKGROUND

We review a trial court's denial of a motion to suppress for legal error. *State v. Rodriguez-Perez*, 262 Or App 206, 208, 325 P3d 39 (2014). We are bound by the trial court's findings of fact so long as there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We recount the facts below in some detail given the nature of the arguments, the complexity of the incident, and the fact that the trial court made no explicit ruling on whether defendant was seized under Article I, section 9. The facts come both from the testimony given at the suppression hearing as well as the extensive police body camera footage, which the trial court reviewed and summarized during its oral ruling on the motion to suppress. Where necessary, we supplement the trial court's summary of the events, including providing important time stamps from the record.

On the night of November 23, 2018, defendant was a passenger in a vehicle driven by his fiancée, LeClaire, when they were stopped by Officer Henderson for speeding and lack of insurance on the vehicle. At the beginning of the stop, LeClaire stated that she did not have her driver's license on

her, and defendant offered his license to Henderson. LeClaire gave Henderson a false name, but when pressed for a middle name and date of birth, she admitted to providing a false name and gave Henderson her real name and driver's license, explaining that her license was suspended and that she might have an outstanding warrant. LeClaire was detained and read her rights. Defendant remained in the vehicle.

Henderson then asked defendant if his license was "good," and defendant said yes and stated he should have been the one driving because LeClaire's license was suspended. At the suppression hearing, Henderson testified that he was initially suspicious of the validity of the license defendant had handed him, due to its coloring and because it was "funny looking." Henderson had dispatch run defendant's license, which was under the name DT, and dispatch subsequently informed Henderson that the license number was valid. The information from dispatch came in seven and one-half minutes into the stop. Henderson did not return the license to defendant at that time.

Henderson obtained consent from LeClaire to search the vehicle, and asked defendant to step out and walk LeClaire's dog for a minute. The dog, a large German Shephard, was in the back seat of the car and barked at Henderson when he approached the vehicle. Defendant complied with Henderson's request, and, as he exited the vehicle, he took a computer bag with him. Henderson asked if there was anything in the bag, and defendant answered, "Just computers, two really expensive laptops," and offered to show Henderson. Henderson did not look inside the bag at that time and began his search of the car.

Henderson asked if there was anything in the car that defendant knew about, and defendant said no.[1] While Henderson searched the car, he asked defendant about where he and LeClaire lived and what they were doing in town,[2] and discussed defendant getting insurance put on

---

[1] Henderson's queries about whether there was anything in the bag or the car implied anything *illegal* that the officer should know about.

[2] Early in the stop defendant had indicated that they were visiting a friend of his, Borden, who Henderson stated was "bad news" and someone the police dealt with a lot.

the car. During the search of the vehicle, Henderson was informed by dispatch that there was an unentered warrant for LeClaire's arrest. Henderson informed dispatch that LeClaire was in custody, and he requested a cover unit. Also during the search, Henderson found a needle in a backpack and a bank card with the name LeClaire had initially given at the beginning of the stop. By that point, the stop had lasted 26 minutes.

Deputy Tugwell arrived on the scene. Henderson filled him in on what had happened so far and indicated that he had not had a chance to talk to defendant much, but that defendant had been adamant to get the computer bag out of the car with him. Henderson asked Tugwell to try to build a rapport with defendant and see if he could get defendant to let them pat him down. Tugwell stood by defendant and spoke to him while Henderson continued to search the vehicle.

Thirty-one minutes into the stop, Henderson discovered three Washington State driver's licenses, with three different names, all with LeClaire's picture on them. After showing them to Tugwell and asking LeClaire about them, Henderson asked defendant if he knew anything about the fake IDs. Defendant denied any knowledge of them. Henderson and Tugwell compared the fake IDs to the Washington driver's license defendant had provided at the beginning of the traffic stop (which Henderson still had in his possession) and wondered how to tell the difference. Henderson testified at the suppression hearing that it was at this point that he formed reasonable suspicion that defendant had committed some sort of crime. Henderson returned to his patrol car, asked LeClaire if defendant's ID was fake, and called dispatch to request a photo from Washington to try to confirm whether defendant was the person listed on the identification.

While Henderson waited for a response, Tugwell continued to stand next to defendant and talk to him, asking defendant if he would consent to Tugwell looking through the computer bag, noting his concern for safety and that the events of the evening were curious and getting weirder. Defendant did not consent to a search of his bag,

initially explaining that he did not want his computers to get wet in the rain, and eventually stating that he knew his rights and was not consenting at that time. However, he did at one point open the bag to let Tugwell see inside the top.

Henderson then received a photo from dispatch of the person associated with the DT license defendant had provided. He showed the picture to defendant and said that defendant was not being honest about something because he did not match the picture. Defendant told Henderson that he had been the victim of identity theft years earlier. Henderson stated that he was very suspicious based on the fake IDs found in the car and their similarity to the ID defendant had provided. Henderson asked defendant for his social security number and defendant provided a number. Henderson continued to investigate defendant's identity, attempting to get confirmation one way or another from dispatch whether defendant really was DT. He also asked defendant again whether he had anything on him and whether he would consent to a pat down or search of his bag. Defendant indicated that Tugwell had looked in the bag, and again opened the top to show the computers, but did not otherwise consent to a search of his person or bag.

While waiting for information from dispatch, Henderson continued his search of LeClaire's vehicle and found a pipe, which LeClaire confirmed would test positive for heroin. He also found another driver's license, for JB.

Henderson then received a call from dispatch informing him that the information the dispatcher had received from Washington matched the information she had provided to Henderson earlier, and that DT was a victim of identity theft.[3] Henderson told defendant that it sounded like everything he was saying was lining up, and defendant asked what he was to do now, as he obviously was not taking the car.

---

[3] Henderson later confirmed that he had misunderstood what the dispatcher told him at that point, that he thought she was confirming defendant's story of identity theft, rather than informing Henderson that the individual whose photo the dispatcher had provided earlier was the real DT and that *he* was the one who was the victim of identity theft, not defendant.

One hour and 16 minutes into the incident, a third officer arrived on the scene. Henderson filled him in on the progress so far and indicated that defendant was acting a little weird. The new officer asked if Henderson had searched defendant's bag. Henderson told him no, that he had only "kind of" seen inside. The new officer told Henderson that he had probable cause to search defendant's bag. Henderson then went to defendant and said, "From what I'm seeing in the car, can I see inside your bag?" Defendant said "yeah" and opened the bag. He began naming items as Henderson looked inside with a flashlight. It was at that point that Henderson spotted a needle in the bag. Defendant said that it was not his, that he had picked stuff up from the car when the police pulled them over, because he did not want LeClaire to get in trouble. Henderson then took the bag from defendant and placed it on the hood of his patrol vehicle for a further search. Upon the full search of the bag Henderson found multiple IDs and social security cards for other people. At that point, defendant was detained and handcuffed. Officer Henderson stated that it was for possession of things that were not his.

One hour and 32 minutes into the traffic stop, Henderson had another call with dispatch in which he clarified that defendant was not DT. Following that conversation and further investigation into one of the IDs found in defendant's bag, which was determined to be stolen, Henderson returned to defendant and read him his rights.

In anticipation of trial, defendant filed a motion to suppress all evidence seized and information obtained as a result of the encounter, arguing that he was stopped without any reasonable suspicion of criminal activity on his part, or probable cause that he was committing a traffic infraction.[4] On the factual record, the trial court made specific legal findings regarding the various stages of the search, including that there was a lawful basis for the initial traffic stop; the search of the vehicle was conducted per consent of the

---

[4] At the suppression hearing defendant also challenged the admissibility of any statements he made to the police prior to receiving *Miranda* warnings. The trial court found that defendant was not subject to custodial interrogation prior to being placed in handcuffs and detained by the officers. Defendant does not challenge that ruling in this appeal.

driver; and the warrantless search of defendant's bag was valid under three exceptions to the warrant requirement (including defendant's consent, the mobile vehicle exception, and search incident to LeClaire's arrest). As stated above, the trial court did not expressly rule on defendant's argument that he had been illegally stopped under Article I, section 9. But in the context of its ruling on defendant's claim of an Article I, section 12, violation, the trial court found that Henderson believed that defendant was free to leave based on Henderson's statements to LeClaire that defendant was "valid" and could watch over the dog. The trial court further found that:

> "Significant to the Court is the statement the officer makes to the Defendant when he comes back. He doesn't order him out of the car. In fact, he doesn't tell him to stay by the car. He tells him, 'Go walk the dog. Go walk the dog.'

> "It's clear at that point the Defendant could have taken the leash, leashed the dog and walked away. He's never told to, 'Hey, stand here. Stay out here by the car. Just hold the dog.' He tells him to go walk it.

> "It starts raining. He—but he hangs out by the vehicle. He keeps telling the officer, 'I know I can't drive away in the car.' The officer really doesn't respond to him and say, 'Well, no, you can't.' He start—there's some discussion there about whether or not, um—how he's going to get to Sunnyridge.

> "The officer, at this point, is—Defendant gives a pretty elaborate story about how he came into possession of the identification, how he, um—who he is, how—why his driver's license isn't matching the information he's getting from dispatch. And it's obvious to the Court the officer is believing him in a large part, um, sort of buying the story, if you will. Um, something's not lining up, but he keeps checking um, trying to corroborate some of what Defendant is saying, um, because Defendant is very compelling in his statements that he's making to the officer. The officer never tells him he's not free to leave. Um, the—

> "So I find up until that point, during that whole discussion that he's having with the officers, both Deputy Tugwell and Officer Henderson outside of the vehicle, are not compelling circumstances. And they don't have to expressly tell the Defendant he's free to leave. But, um, it appears to

the Court, um, that he was. Um, he decides, um, to stick around. He's engaging with the officers. He is being asked questions about the circumstances surrounding some of the identification and some of the information.

"The officer continues—well, yes, he retains his ID, because he's continuing trying to ascertain who exactly the Defendant is, and as the officer keeps saying, things aren't lining up. So I don't find the questioning by the officer prior to placing him into handcuffs to be custodial interrogation at that point."

Thereafter, defendant entered a conditional guilty plea, reserving his right to challenge the denial of his motion to suppress under ORS 135.335(3). This appeal followed.

## ANALYSIS

Article I, section 9, of the Oregon Constitution ensures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"[5] Not every encounter between police officers and individuals constitutes a seizure for constitutional purposes, and such encounters can range from "mere conversations," which do not implicate constitutional concerns, to arrests, which require probable cause. *State v. McKibben*, 320 Or App 26, 29-30, 512 P3d 464 (2022). Whether an individual has been stopped, and thus "seized," is an objective test. An individual is considered to be seized when there is "the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013). In other words, a person is "seized" for purposes of Article I, section 9, either "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis in original; footnote omitted).

---

[5] Though defendant also challenged the admissibility of the evidence under the Fourth Amendment to the United States Constitution at the suppression hearing, defendant did not raise that argument on appeal and so we do not consider its application here.

When an encounter advances from a conversation to the point of an investigatory stop, and thus a seizure of the individual, the stop must be accompanied by reasonable suspicion. *Backstrand*, 354 Or at 399 (citing *State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013)). Reasonable suspicion exists when "an officer can point to specific and articulable facts that give rise to a reasonable inference that the [individual] committed or was about to commit a specific crime or type of crime." *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017). Absent reasonable suspicion, a stop is unlawful, and all evidence discovered as a result of the unlawful police action is presumptively tainted by the violation and must be suppressed. *State v. Newton*, 286 Or App 274, 288, 398 P3d 390 (2017). The state can rebut the presumption by establishing by a preponderance of the evidence that the evidence was not the product of police exploitation of the illegal stop and is therefore admissible. *State v. Unger*, 356 Or 59, 75, 333 P3d 1009 (2014).

The legal analysis in this case requires us to answer two questions: First, was defendant himself stopped during the encounter with Henderson? Second, if so, did that stop occur after Henderson developed reasonable suspicion of defendant's criminal activity?

Our answer to the first question is "yes." Defendant was stopped during the encounter with Henderson. As noted above, a person is "seized" for purposes of Article I, section 9, in either one of two situations: "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred." *Ashbaugh*, 349 Or at 316 (emphasis in original). Because the latter part of the test depends on the totality of the circumstances, the issue is "whether the circumstances as a whole transformed the encounter into a seizure," even if the circumstances individually would not create a seizure. *State v. Anderson*, 354 Or 440, 453, 313 P3d 1113 (2013). As we recently held in *McKibben*, "[i]n answering that question, we consider the content of the questions [asked by a police officer], the manner of asking them, or other actions that police take (along with the circumstances

in which they take them).” 320 Or App at 30 (internal quotation marks and citations omitted, brackets in original).

Chief among the factors to be considered here is Henderson's retention of the identification defendant provided.[6] We recognize that an individual is not *per se* seized simply by providing their identification to an officer.

> “[P]olice requests for information or cooperation do not implicate Article I, section 9, as long as the officer does no more than seek the individual's cooperation through noncoercive questioning and conduct. A request for identification, in and of itself, is not a seizure. Nor is an officer's act of checking the validity of that identification, in and of itself, a seizure. For a request and verification of identification to amount to a seizure, something more is required on an officer's part.”

*Backstrand*, 354 Or at 417. However, a seizure can occur when an officer retains an identification past a “reasonable period for purposes of examining and verifying it[.]” *Id.* at 416 (citing *State v. Painter*, 296 Or 422, 676 P3d 309 (1984), for the proposition that some exercise of coercive authority by the officer was required to advance the encounter to a seizure, such as retention of the identification after examination and a continuation of investigatory activities).

In this case, defendant voluntarily offered up identification to Henderson when LeClaire initially told Henderson that she did not have her license on her. Henderson called in the license to his dispatcher to run it and received the all-clear call seven and one-half minutes into the stop. However, despite hearing that the license was clear, Henderson did

---

[6] We acknowledge that the identification defendant presented was fake. Some of the rationale contained in the case law regarding retention of IDs by the police emphasizes the importance of one's identification, and that a reasonable person would not feel free to depart without their driver's license. *State v. Lay*, 242 Or App 38, 44, 252 P3d 850 (2011) (“[A] reasonable person would not feel free to abandon that indispensable piece of identification.”). That rationale does not necessarily carry the same weight when applied to a fake ID. However, neither party emphasized the false nature of the identification in discussing whether or not defendant was seized, so we decline to do so here. Regardless, throughout the encounter defendant had assumed the persona of DT, so within the context of the encounter, it was his identification. Until Henderson received clear confirmation that defendant was not DT, he was operating as if he was retaining defendant's identification.

not return the ID to defendant at that point, or at any time during the encounter. Henderson's retention of defendant's license is thus unlike the situation in *Backstrand* in which the officer's brief retention of a license did not transform a mere encounter into a seizure. In this case, there was "something more," which was the retention of defendant's license throughout the entire encounter while Henderson continued to investigate other crimes, a situation the Supreme Court has recognized as indicating that a defendant was seized. *Painter*, 296 Or at 425.

Although the trial court found that Henderson retained defendant's license "because he's continuing trying to ascertain who exactly the Defendant is," the record demonstrates that true questions over defendant's identity did not arise until Henderson had already retained the ID for over half an hour. Despite Henderson's testimony at the suppression hearing that he was somewhat suspicious of the ID given its coloring, dispatch had informed Henderson that it was "clean" and had not identified any issues. Therefore, at the time he retained defendant's license, Henderson was not actively conducting any further investigation into defendant's identity. Whether Henderson later developed reasons to doubt defendant's identity, and later took steps to investigate it, does not bear on a determination of whether his initial retention was longer than necessary under *Backstrand* and *Painter*.

In addition, at Henderson's request, additional law enforcement reported to the scene. After Tugwell arrived, Henderson had Tugwell stand near defendant and engage him in conversation while Henderson continued his search. The fact that Henderson called for additional law enforcement who arrived not to assist in the search, but to stand by and essentially guard defendant, would contribute to a reasonable person believing that their liberty or freedom of movement was substantially restricted.

Furthermore, the content and manner of Henderson's questions conveyed a suspicion that defendant was engaged in illegal activity. An individual is not stopped simply because an officer makes statements conveying possible suspicion or when an officer makes an inquiry about criminal activity.

*State v. Nelson*, 294 Or App 793, 797, 433 P3d 370 (2018). However, the questions an officer asks and the manner of asking them can factor into an individual's understanding of whether their liberty is being restricted. *McKibben*, 320 Or App at 30.

As defendant was exiting the vehicle, Henderson asked if there was anything in defendant's bag or anything in the car that Henderson should know about, implying that he was asking about anything illegal, such as contraband or weapons. As Henderson searched the car, he asked defendant why they were going to Borden's house, when Borden had a criminal history and was "bad news." Henderson's questions and tone with defendant conveyed his suspicion that defendant was potentially engaged in criminal activity, and that Henderson did not believe everything that defendant was telling him.

Finally, we address defendant's argument that Henderson controlled defendant's movements by asking defendant to step out of the vehicle, hold LeClaire's dog while Henderson searched the car, and move the dog out of Henderson's way during the search. The state counters that defendant was clearly free to leave, as Henderson asked him to walk LeClaire's dog while the car was searched, something the state characterizes as a "volunteer task with attendant responsibilities and freedom of movement." We conclude that Henderson's actions fall somewhere in the middle of the two positions. Henderson did not control defendant's location to the extent that defendant asserts, but neither did he allow defendant as much freedom of movement as the state claims.

Simply asking defendant to step out of the car while Henderson searched the vehicle does not rise to the level of a seizure for purposes of Article I, section 9. *State v. Graves*, 278 Or App 126, 133-35, 373 P3d 1197, *rev den*, 360 Or 465 (2016) (recounting a number of Court of Appeals cases in which a passenger in a lawfully stopped vehicle was not considered to be seized simply because the officer asked them to step out of the vehicle). Passengers in vehicles that are stopped for traffic infractions face some inconvenience and imposition on their ability to carry on with their movements

without their constitutional rights being implicated. *State v. Olson*, 116 Or App 525, 528, 842 P2d 424 (1992) ("There is no dispute but that a passenger in an automobile must put up with some inconvenience and delay following a traffic stop without having been 'stopped' in the legal sense."). In addition, many of the requests Henderson made for defendant to "hang out" somewhere, appeared to be for purposes of allowing Henderson to continue with his search of the vehicle; in effect, trying to control the location of the dog rather than defendant.

That said, defendant was offered little choice in the matter of whether to take charge of LeClaire's dog, as Henderson presented it as a request from LeClaire herself. It is clear from the context of the conversation and the circumstances that Henderson's request to "walk the dog" was not an invitation to walk away from the scene but was a request to take charge of the dog so that Henderson could search the car. Further, after defendant accepted that responsibility, he was prevented from doing what he wanted to do, which was to return the dog to the car. As indicated, we place less emphasis on this circumstance of the encounter than the parties do. We view this as neither dispositive nor irrelevant, but simply as background facts we consider in our totality of the circumstances analysis.

In sum, given the totality of the circumstances, we conclude that a reasonable person in defendant's position would understand that Henderson's actions—including retaining defendant's identification while asking him questions about contraband and his association with a known criminal, calling for additional officers, and having one officer stand with him throughout the remainder of the encounter—were a show of authority that restrained his liberty or freedom of movement. *See Ashbaugh*, 349 Or at 316; *McKibben*, 320 Or App at 31-32. Defendant was thus stopped as a matter of law.

We turn to the second question, which is whether, at the time the stop occurred, Henderson had developed reasonable suspicion of defendant's criminal activity. Our answer to this question is "no." We conclude that defendant was stopped prior to the development of reasonable suspicion.

Henderson testified at the suppression hearing that he was suspicious of the validity of the ID defendant provided upon first seeing it due to its coloring and because it looked "funny." However, he further testified that he only developed reasonable suspicion that defendant was committing some sort of crime upon discovery of the three fake IDs in LeClaire's car and noting their similarity to the ID defendant had provided. On this record, we find that at that point in time—not earlier—Henderson's "subjective belief [was] objectively reasonable under the totality of the circumstances." *State v. Bowen*, 308 Or App 505, 507, 481 P3d 370 (2021) (citing *State v. Kreis*, 365 Or 659, 665, 451 P3d 954 (2019)). Notably, Henderson discovered those fake IDs 31 minutes into the stop, long after he had taken and retained defendant's license, questioned defendant about possible contraband and criminal associations, and obtained a backup officer to stand with defendant and question him.

A stop without reasonable suspicion is unlawful. *Backstrand*, 354 Or at 399. Because defendant was unlawfully stopped, all evidence discovered as a result of the stop is presumptively tainted. *Unger*, 356 Or at 84. In such situations, the state may rebut the presumption by establishing that the disputed evidence did not derive from the preceding illegality. *State v. Miller*, 267 Or App 382, 398, 340 P3d 740 (2014). While the state argues on appeal that defendant's eventual consent to the search of his bag was not related to any prior unlawful stop, the state did not advance that argument, or any other attenuation argument, during the suppression hearing, and thus we decline to consider it here. *See State v. Dawson*, 282 Or App 335, 347, 386 P3d 165 (2016) (declining to consider the state's argument that discovery of the evidence was attenuated from the illegality because it was not raised below, and "'the burden has long been on the state to establish attenuation'" (quoting *State v. Jones*, 275 Or App 771, 776, 365 P3d 679 (2015)); *State v. Heater*, 271 Or App 538, 543, 351 P3d 776 (2015) (declining to entertain the state's argument regarding attenuation because the state had only argued at the suppression hearing that no police illegality occurred at all and the record might have developed differently if the state had made the argument below that it made on appeal). All evidence discovered as

a result of the unlawful stop of defendant is tainted by the officer's illegal actions. The trial court therefore erred in denying defendant's motion to suppress.

Reversed and remanded.